# MICHIGAN DEPARTMENT OF STATE
## POLICE ET AL. *v.* SITZ ET AL.

No. 88–1897.   Argued February 27, 1990—Decided June 14, 1990

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 455. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 456. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined as to Parts I and II, *post*, p. 460.

*Thomas L. Casey*, Assistant Solicitor General of Michigan, argued the cause for petitioners. With him on the briefs were *Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Patrick J. O'Brien*, Assistant Attorney General.

*Stephen L. Nightingale* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dennis,* and *Deputy Solicitor General Bryson.*

*Mark Granzotto* argued the cause for respondents. With him on the brief were *Deborah L. Gordon, William C. Gage,* and *John A. Powell.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Richard B. Iglehart,* Chief Assistant Attorney General, *John H. Sugiyama,* Senior Assistant Attorney General, *Morris Beatus,* Supervising Deputy Attorney General, and *Ronald E. Niver,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Robert A. Butterworth* of Florida, *Lacy H. Thornburg* of North Carolina, and *James M. Shannon* of Massachusetts; for the State of Illinois et al. by *Neil F. Hartigan,* Attorney General of Illinois, *Robert J. Ruiz,* Solicitor General, and *Terence M. Madsen, Marcia L. Friedl,* and *Michael J. Singer,* Assistant Attorneys General, *Don Siegelman,* Attorney General of Alabama, *Steve Clark,* Attorney General of Arkansas, *Duane Woodard,* Attorney General of Colorado, *Clarine Nardi Riddle,* Acting Attorney General of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Michael J. Bowers,* Attorney General of Georgia, *Jim Jones,* Attorney General of Idaho, *Tom Miller,* Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, *Frederic J. Cowan,* Attorney General of Kentucky, *James E. Tierney,* Attorney General of Maine, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Hubert H. Humphrey III,* Attorney General of Minnesota, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *John P. Arnold,* Attorney General of New Hampshire, *Peter N. Perretti, Jr.,* Attorney General of New Jersey, *Hal Stratton,* Attorney General of New Mexico, *Robert Abrams,* Attorney General of New York, *Lacy H. Thornburg,* Attorney General of North Carolina, *Nicholas Spaeth,* Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *T. Travis Medlock,* Attorney General of South Carolina, *Roger A. Tellinghuisen,* Attorney General of South Dakota, *Mary Sue Terry,* Attorney General of Virginia, and *Joseph B. Meyer,* Attorney General of Wyoming; for American Alliance for Rights and Responsibilities, Inc., et al. by *Richard A. Rossman* and *Abraham Singer;* for the Insurance Institute for Highway Safety et al. by *Michele McDowell Fields, Andrew R. Hricko, Stephen L. Oesch,* and *Ronald G. Precup;* for the National Governors' Association et al. by *Benna Ruth Solomon, Andrew L. Frey,* and *Erika*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case poses the question whether a State's use of highway sobriety checkpoints violates the Fourth and Fourteenth Amendments to the United States Constitution. We hold that it does not and therefore reverse the contrary holding of the Court of Appeals of Michigan.

Petitioners, the Michigan Department of State Police and its director, established a sobriety checkpoint pilot program in early 1986. The director appointed a Sobriety Checkpoint Advisory Committee comprising representatives of the State Police force, local police forces, state prosecutors, and the University of Michigan Transportation Research Institute. Pursuant to its charge, the advisory committee created guidelines setting forth procedures governing checkpoint operations, site selection, and publicity.

Under the guidelines, checkpoints would be set up at selected sites along state roads. All vehicles passing through a checkpoint would be stopped and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the traffic flow where an officer would check the motorist's driver's license and car registration and, if warranted, conduct further sobriety tests. Should the field tests and the officer's observations suggest that the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately.

Z. Jones; for the Washington Legal Foundation et al. by Richard K. Willard, Daniel J. Popeo, and Paul D. Kamenar; and for the Michigan State Chapters of Mothers Against Drunk Driving by Michael B. Rizik, Jr.

Briefs of amici curiae were filed for the American Federation of Labor and Congress of Industrial Organizations by Walter Kamiat and Laurence Gold; for the Appellate Committee of the California District Attorneys Association by Ira Reiner, Harry B. Sondheim, and Dirk L. Hudson; and for the National Organization of Mothers Against Drunk Driving by David Bryant and Eric R. Cromartie.

The first — and to date the only — sobriety checkpoint operated under the program was conducted in Saginaw County with the assistance of the Saginaw County Sheriff's Department. During the 75-minute duration of the checkpoint's operation, 126 vehicles passed through the checkpoint. The average delay for each vehicle was approximately 25 seconds. Two drivers were detained for field sobriety testing, and one of the two was arrested for driving under the influence of alcohol. A third driver who drove through without stopping was pulled over by an officer in an observation vehicle and arrested for driving under the influence.

On the day before the operation of the Saginaw County checkpoint, respondents filed a complaint in the Circuit Court of Wayne County seeking declaratory and injunctive relief from potential subjection to the checkpoints. Each of the respondents "is a licensed driver in the State of Michigan . . . who regularly travels throughout the State in his automobile." See Complaint, App. 3a–4a. During pretrial proceedings, petitioners agreed to delay further implementation of the checkpoint program pending the outcome of this litigation.

After the trial, at which the court heard extensive testimony concerning, *inter alia*, the "effectiveness" of highway sobriety checkpoint programs, the court ruled that the Michigan program violated the Fourth Amendment and Art. 1, § 11, of the Michigan Constitution. App. to Pet. for Cert. 132a. On appeal, the Michigan Court of Appeals affirmed the holding that the program violated the Fourth Amendment and, for that reason, did not consider whether the program violated the Michigan Constitution. 170 Mich. App. 433, 445, 429 N. W. 2d 180, 185 (1988). After the Michigan Supreme Court denied petitioners' application for leave to appeal, we granted certiorari. 493 U. S. 806 (1989).

To decide this case the trial court performed a balancing test derived from our opinion in *Brown* v. *Texas*, 443 U. S. 47 (1979). As described by the Court of Appeals, the test in-

volved "balancing the state's interest in preventing accidents caused by drunk drivers, the effectiveness of sobriety checkpoints in achieving that goal, and the level of intrusion on an individual's privacy caused by the checkpoints." 170 Mich. App., at 439, 429 N. W. 2d, at 182 (citing *Brown, supra,* at 50–51). The Court of Appeals agreed that "the *Brown* three-prong balancing test was the correct test to be used to determine the constitutionality of the sobriety checkpoint plan." 170 Mich. App., at 439, 429 N. W. 2d, at 182.

As characterized by the Court of Appeals, the trial court's findings with respect to the balancing factors were that the State has "a grave and legitimate" interest in curbing drunken driving; that sobriety checkpoint programs are generally "ineffective" and, therefore, do not significantly further that interest; and that the checkpoints' "subjective intrusion" on individual liberties is substantial. *Id.,* at 439, 440, 429 N. W. 2d, at 183, 184. According to the court, the record disclosed no basis for disturbing the trial court's findings, which were made within the context of an analytical framework prescribed by this Court for determining the constitutionality of seizures less intrusive than traditional arrests. *Id.,* at 445, 429 N. W. 2d, at 185.

In this Court respondents seek to defend the judgment in their favor by insisting that the balancing test derived from *Brown* v. *Texas, supra,* was not the proper method of analysis. Respondents maintain that the analysis must proceed from a basis of probable cause or reasonable suspicion, and rely for support on language from our decision last Term in *Treasury Employees* v. *Von Raab,* 489 U. S. 656 (1989). We said in *Von Raab:*

"[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant

or some level of individualized suspicion in the particular context." *Id.*, at 665–666.

Respondents argue that there must be a showing of some special governmental need "beyond the normal need" for criminal law enforcement before a balancing analysis is appropriate, and that petitioners have demonstrated no such special need.

But it is perfectly plain from a reading of *Von Raab*, which cited and discussed with approval our earlier decision in *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976), that it was in no way designed to repudiate our prior cases dealing with police stops of motorists on public highways. *Martinez-Fuerte*, *supra*, which utilized a balancing analysis in approving highway checkpoints for detecting illegal aliens, and *Brown* v. *Texas*, *supra*, are the relevant authorities here.

Petitioners concede, correctly in our view, that a Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint. Tr. of Oral Arg. 11; see *Martinez-Fuerte*, *supra*, at 556 ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment"); *Brower* v. *County of Inyo*, 489 U. S. 593, 597 (1989) (Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*" (emphasis in original)). The question thus becomes whether such seizures are "reasonable" under the Fourth Amendment.

It is important to recognize what our inquiry is *not* about. No allegations are before us of unreasonable treatment of any person after an actual detention at a particular checkpoint. See *Martinez-Fuerte*, 428 U. S., at 559 ("[C]laim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review"). As pursued in the lower courts, the instant action challenges only the use of sobriety checkpoints generally. We address only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and ob-

servation by checkpoint officers. Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard. *Id.*, at 567.

No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion. The anecdotal is confirmed by the statistical. "Drunk drivers cause an annual death toll of over 25,000[*] and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage." 4 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.8(d), p. 71 (2d ed. 1987). For decades, this Court has "repeatedly lamented the tragedy." *South Dakota* v. *Neville*, 459 U. S. 553, 558 (1983); see *Breithaupt* v. *Abram*, 352 U. S. 432, 439 (1957) ("The increasing slaughter on our highways . . . now reaches the astounding figures only heard of on the battlefield").

Conversely, the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at sobriety checkpoints—is slight. We reached a similar conclusion as to the intrusion on motorists subjected to a brief stop at a highway checkpoint for detecting illegal aliens. See *Martinez-Fuerte, supra,* at 558. We see virtually no difference between the levels of intrusion on law-abiding motorists

---

*Statistical evidence incorporated in JUSTICE STEVENS' dissent suggests that this figure declined between 1982 and 1988. See *post*, at 460–461, n. 2, and 467–468, n. 7 (citing U. S. Dept. of Transportation, National Highway Traffic Safety Administration, Fatal Accident Reporting System 1988). It was during this same period that police departments experimented with sobriety checkpoint systems. Petitioners, for instance, operated their checkpoint in May 1986, see App. to Pet. for Cert. 6a, and the Maryland State Police checkpoint program, about which much testimony was given before the trial court, began in December 1982. See *id*, at 84a. Indeed, it is quite possible that jurisdictions which have recently decided to implement sobriety checkpoint systems have relied on such data from the 1980's in assessing the likely utility of such checkpoints.

from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorist would seem identical save for the nature of the questions the checkpoint officers might ask. The trial court and the Court of Appeals, thus, accurately gauged the "objective" intrusion, measured by the duration of the seizure and the intensity of the investigation, as minimal. See 170 Mich. App., at 444, 429 N. W. 2d, at 184.

With respect to what it perceived to be the "subjective" intrusion on motorists, however, the Court of Appeals found such intrusion substantial. See *supra*, at 449. The court first affirmed the trial court's finding that the guidelines governing checkpoint operation minimize the discretion of the officers on the scene. But the court also agreed with the trial court's conclusion that the checkpoints have the potential to generate fear and surprise in motorists. This was so because the record failed to demonstrate that approaching motorists would be aware of their option to make U-turns or turnoffs to avoid the checkpoints. On that basis, the court deemed the subjective intrusion from the checkpoints unreasonable. *Id.*, at 443–444, 429 N. W. 2d, at 184–185.

We believe the Michigan courts misread our cases concerning the degree of "subjective intrusion" and the potential for generating fear and surprise. The "fear and surprise" to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop. This was made clear in *Martinez-Fuerte*. Comparing checkpoint stops to roving patrol stops considered in prior cases, we said:

> "[W]e view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop. In [*United States* v.] *Ortiz*, [422 U. S. 891 (1975),] we noted:

"'[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion. 422 U. S., at 894–895.'" *Martinez-Fuerte*, 428 U. S., at 558.

See also *id*, at 559. Here, checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle. The intrusion resulting from the brief stop at the sobriety checkpoint is for constitutional purposes indistinguishable from the checkpoint stops we upheld in *Martinez-Fuerte*.

The Court of Appeals went on to consider as part of the balancing analysis the "effectiveness" of the proposed checkpoint program. Based on extensive testimony in the trial record, the court concluded that the checkpoint program failed the "effectiveness" part of the test, and that this failure materially discounted petitioners' strong interest in implementing the program. We think the Court of Appeals was wrong on this point as well.

The actual language from *Brown* v. *Texas*, upon which the Michigan courts based their evaluation of "effectiveness," describes the balancing factor as "the degree to which the seizure advances the public interest." 443 U. S., at 51. This passage from *Brown* was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferrable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives

remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers. *Brown*'s rather general reference to "the degree to which the seizure advances the public interest" was derived, as the opinion makes clear, from the line of cases culminating in *Martinez-Fuerte, supra*. Neither *Martinez-Fuerte* nor *Delaware* v. *Prouse*, 440 U. S. 648 (1979), however, the two cases cited by the Court of Appeals as providing the basis for its "effectiveness" review, see 170 Mich. App., at 442, 429 N. W. 2d, at 183, supports the searching examination of "effectiveness" undertaken by the Michigan court.

In *Delaware* v. *Prouse, supra*, we disapproved random stops made by Delaware Highway Patrol officers in an effort to apprehend unlicensed drivers and unsafe vehicles. We observed that *no* empirical evidence indicated that such stops would be an effective means of promoting roadway safety and said that "[i]t seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed." *Id.*, at 659–660. We observed that the random stops involved the "kind of standardless and unconstrained discretion [which] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.*, at 661. We went on to state that our holding did not "cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." *Id.*, at 663, n. 26.

Unlike *Prouse*, this case involves neither a complete absence of empirical data nor a challenge to random highway stops. During the operation of the Saginaw County checkpoint, the detention of the 126 vehicles that entered the checkpoint resulted in the arrest of two drunken drivers.

Stated as a percentage, approximately 1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment. In addition, an expert witness testified at the trial that experience in other States demonstrated that, on the whole, sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped. 170 Mich. App., at 441, 429 N. W. 2d, at 183. By way of comparison, the record from one of the consolidated cases in *Martinez-Fuerte* showed that in the associated checkpoint, illegal aliens were found in only 0.12 percent of the vehicles passing through the checkpoint. See 428 U. S., at 554. The ratio of illegal aliens detected to vehicles stopped (considering that on occasion two or more illegal aliens were found in a single vehicle) was approximately 0.5 percent. See *ibid.* We concluded that this "record . . . provides a rather complete picture of the effectiveness of the San Clemente checkpoint," *ibid.*, and we sustained its constitutionality. We see no justification for a different conclusion here.

In sum, the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program. We therefore hold that it is consistent with the Fourth Amendment. The judgment of the Michigan Court of Appeals is accordingly reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in the judgment.

I concur only in the judgment.

I fully agree with the Court's lamentations about the slaughter on our highways and about the dangers posed to almost everyone by the driver who is under the influence of alcohol or other drug. I add this comment only to remind the Court that it has been almost 20 years since, in *Perez* v.

*Campbell*, 402 U. S. 637, 657 (1971), in writing for three others (no longer on the Court) and myself, I noted that the "slaughter on the highways of this Nation exceeds the death toll of all our wars," and that I detected "little genuine public concern about what takes place in our very midst and on our daily travel routes." See also *Tate* v. *Short*, 401 U. S. 395, 401 (1971) (concurring statement). And in the Appendix to my writing in *Perez*, 402 U. S., at 672, I set forth official figures to the effect that for the period from 1900 through 1969 motor-vehicle deaths in the United States exceeded the death toll of all our wars. I have little doubt that those figures, when supplemented for the two decades since 1969, would disclose an even more discouraging comparison. I am pleased, of course, that the Court is now stressing this tragic aspect of American life. See *ante*, at 451.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today, the Court rejects a Fourth Amendment challenge to a sobriety checkpoint policy in which police stop all cars and inspect all drivers for signs of intoxication without *any* individualized suspicion that a specific driver is intoxicated. The Court does so by balancing "the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped." *Ante*, at 455. For the reasons stated by JUSTICE STEVENS in Parts I and II of his dissenting opinion, I agree that the Court misapplies that test by undervaluing the nature of the intrusion and exaggerating the law enforcement need to use the roadblocks to prevent drunken driving. See also *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 567 (1976) (BRENNAN, J., dissenting). I write separately to express a few additional points.

The majority opinion creates the impression that the Court generally engages in a balancing test in order to determine

the constitutionality of all seizures, or at least those "dealing with police stops of motorists on public highways." *Ante*, at 450. This is not the case. In most cases, the police must possess probable cause for a seizure to be judged reasonable. See *Dunaway* v. *New York*, 442 U. S. 200, 209 (1979). Only when a seizure is *"substantially* less intrusive," *id.*, at 210 (emphasis added), than a typical arrest is the general rule replaced by a balancing test. I agree with the Court that the initial stop of a car at a roadblock under the Michigan State Police sobriety checkpoint policy is sufficiently less intrusive than an arrest so that the reasonableness of the seizure may be judged, not by the presence of probable cause, but by balancing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown* v. *Texas*, 443 U. S. 47, 51 (1979). But one searches the majority opinion in vain for any acknowledgment that the *reason* for employing the balancing test is that the seizure is minimally intrusive.

Indeed, the opinion reads as if the minimal nature of the seizure *ends* rather than begins the inquiry into reasonableness. Once the Court establishes that the seizure is "slight," *ante*, at 451, it asserts without explanation that the balance "weighs in favor of the state program." *Ante*, at 455. The Court ignores the fact that in this class of minimally intrusive searches, we have generally required the government to prove that it had reasonable suspicion for a minimally intrusive seizure to be considered reasonable. See, *e. g.*, *Delaware* v. *Prouse*, 440 U. S. 648, 661 (1979); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 882–883 (1975); *Terry* v. *Ohio*, 392 U. S. 1, 27 (1968). Some level of individualized suspicion is a core component of the protection the Fourth Amendment provides against arbitrary government action. See *Prouse*, *supra*, at 654–655; *Martinez-Fuerte*, *supra*, at 577 (BRENNAN, J., dissenting) ("Action based merely on

whatever may pique the curiousity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct and to avoiding abuse and harassment"). By holding that no level of suspicion is necessary before the police may stop a car for the purpose of preventing drunken driving, the Court potentially subjects the general public to arbitrary or harassing conduct by the police. I would have hoped that before taking such a step, the Court would carefully explain how such a plan fits within our constitutional framework.

Presumably, the Court purports to draw support from *Martinez-Fuerte, supra,* which is the only case in which the Court has upheld a program that subjects the general public to suspicionless seizures. But as JUSTICE STEVENS demonstrates, *post,* at 463–466, 471–472, the Michigan State Police policy is sufficiently different from the progam at issue in *Martinez-Fuerte* that such reliance is unavailing. Moreover, even if the policy at issue here were comparable to the program at issue in *Martinez-Fuerte,* it does not follow that the balance of factors in this case also justifies abandoning a requirement of individualized suspicion. In *Martinez-Fuerte,* the Court explained that suspicionless stops were justified since "[a] requirement that stops . . . be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." 428 U. S., at 557. There has been no showing in this case that there is a similar difficulty in detecting individuals who are driving under the influence of alcohol, nor is it intuitively obvious that such a difficulty exists. See *Prouse, supra,* at 661. That stopping every car *might* make it easier to prevent drunken driving, but see *post,* at 469–471, is an insufficient justification for abandoning the requirement of individualized suspicion. "The needs of law enforcement stand in constant tension with the Constitution's protections

of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 273 (1973). Without proof that the police cannot develop individualized suspicion that a person is driving while impaired by alcohol, I believe the constitutional balance must be struck in favor of protecting the public against even the "minimally intrusive" seizures involved in this case.

I do not dispute the immense social cost caused by drunken drivers, nor do I slight the government's efforts to prevent such tragic losses. Indeed, I would hazard a guess that today's opinion will be received favorably by a majority of our society, who would willingly suffer the minimal intrusion of a sobriety checkpoint stop in order to prevent drunken driving. But consensus that a particular law enforcement technique serves a laudable purpose has never been the touchstone of constitutional analysis.

> "The Fourth Amendment was designed not merely to protect against official intrusions whose social utility was less as measured by some 'balancing test' than its intrusion on individual privacy; it was designed in addition to grant the individual a zone of privacy whose protections could be breached only where the 'reasonable' requirements of the probable-cause standard were met. Moved by whatever momentary evil has aroused their fears, officials—perhaps even supported by a majority of citizens—may be tempted to conduct searches that sacrifice the liberty of each citizen to assuage the perceived evil. But the Fourth Amendment rests on the principle that a true balance between the individual and society depends on the recognition of 'the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.' *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting)." *New Jersey*

v. *T. L. O.*, 469 U. S. 325, 361–362 (1985) (BRENNAN, J., concurring in part and dissenting in part) (footnote omitted).

In the face of the "momentary evil" of drunken driving, the Court today abdicates its role as the protector of that fundamental right. I respectfully dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join as to Parts I and II, dissenting.

A sobriety checkpoint is usually operated at night at an unannounced location. Surprise is crucial to its method. The test operation conducted by the Michigan State Police and the Saginaw County Sheriff's Department began shortly after midnight and lasted until about 1 a.m. During that period, the 19 officers participating in the operation made two arrests and stopped and questioned 124 other unsuspecting and innocent drivers.[1] It is, of course, not known how many arrests would have been made during that period if those officers had been engaged in normal patrol activities. However, the findings of the trial court, based on an extensive record and affirmed by the Michigan Court of Appeals, indicate that the net effect of sobriety checkpoints on traffic safety is infinitesimal and possibly negative.

Indeed, the record in this case makes clear that a decision holding these suspicionless seizures unconstitutional would not impede the law enforcement community's remarkable progress in reducing the death toll on our highways.[2] Be-

---

[1] The 19 officers present at the sole Michigan checkpoint were not the standard detail; a few were observers. Nevertheless, the standard plan calls for having at least 8 and as many as 12 officers on hand. 1 Record 82–83.

[2] The fatality rate per 100 million miles traveled has steadily declined from 5.2 in 1968 to 2.3 in 1988. During the same span, the absolute number of fatalities also decreased, albeit less steadily, from more than 52,000 in 1968 to appoximately 47,000 in 1988. U. S. Dept. of Transportation, National Highway Traffic Safety Administration, Fatal Accident Report-

cause the Michigan program was patterned after an older program in Maryland, the trial judge gave special attention to that State's experience. Over a period of several years, Maryland operated 125 checkpoints; of the 41,000 motorists passing through those checkpoints, only 143 persons (0.3%) were arrested.[3] The number of man-hours devoted to these

---

ing System 1988, Ch. 1, p. 6 (Dec. 1989) (hereinafter Fatal Accident Reporting System 1988).

Alcohol remains a substantial cause of these accidents, but progress has been made on this front as well:

"Since 1982, alcohol use by drivers in fatal crashes has steadily decreased. The proportion of all drivers who were estimated to have been legally intoxicated ([blood alcohol concentration] of .10 or greater) dropped from 30% in 1982 to 24.6% in 1988. The reduction from 1982–1988 is 18%.

"The proportion of fatally injured drivers who were legally intoxicated dropped from 43.8% in 1982 to 37.5% in 1988—a 14% decrease.

"During the past seven years, the proportion of drivers involved in fatal crashes who were intoxicated decreased in all age groups. The most significant drop continues to be in the 15 to 19 year old age group. In 1982, NHTSA estimated that 28.4% of these teenaged drivers in fatal crashes were drunk, compared with 18.3% in 1988." Id., Overview, p. 2.

All of these improvements have been achieved despite resistance—now ebbing at last—to the use of airbags and other passive restraints, improvements that would almost certainly result in even more dramatic reductions in the fatality rate. Indeed, the National Highway Traffic Safety Administration estimates that an additional 5,000 lives per year would be saved if the 21 States without mandatory safety belt usage laws were to enact such legislation—even though only 50% of motorists obey such laws. Id., Overview, p. 4, Ch. 2, p. 13.

[3] App. to Pet. for Cert. 80a–81a. The figures for other States are roughly comparable. See, e. g., State ex rel. Ekstrom v. Justice Ct., 136 Ariz. 1, 2, 663 P. 2d 992, 993 (1983) (5,763 cars stopped, 14 persons arrested for drunken driving); Ingersoll v. Palmer, 43 Cal. 3d 1321, 1327, 743 P. 2d 1299, 1303 (1987) (233 vehicles screened, no arrests for drunken driving); State v. Garcia, 481 N. E. 2d 148, 150 (Ind. App. 1985) (100 cars stopped, seven arrests for drunken driving made in two hours of operation); State v. McLaughlin, 471 N. E. 2d 1125, 1137 (Ind. App. 1984) (115 cars stopped, three arrests for drunken driving); State v. Deskins, 234 Kan. 529, 545, 673 P. 2d 1174, 1187 (1983) (Prager, J., dissenting) (2,000 to 3,000 vehicles stopped, 15 arrests made, 140 police man-hours consumed); Commonwealth v. Trumble, 396 Mass. 81, 85, 483 N. E. 2d 1102, 1105

operations is not in the record, but it seems inconceivable that a higher arrest rate could not have been achieved by more conventional means.[4] Yet, even if the 143 checkpoint arrests were assumed to involve a net increase in the number of drunken driving arrests per year, the figure would still be insignificant by comparison to the 71,000 such arrests made by Michigan State Police without checkpoints in 1984 alone. See App. to Pet. for Cert. 97a.

Any relationship between sobriety checkpoints and an actual reduction in highway fatalities is even less substantial than the minimal impact on arrest rates. As the Michigan Court of Appeals pointed out: "Maryland had conducted a study comparing traffic statistics between a county using checkpoints and a control county. The results of the study showed that alcohol-related accidents in the checkpoint county decreased by ten percent, whereas the control county saw an eleven percent decrease; and while fatal accidents in the control county fell from sixteen to three, fatal accidents in the checkpoint county actually doubled from the prior year." 170 Mich. App. 433, 443, 429 N. W. 2d 180, 184 (1988).

In light of these considerations, it seems evident that the Court today misapplies the balancing test announced in *Brown* v. *Texas*, 443 U. S. 47, 50–51 (1979). The Court overvalues the law enforcement interest in using sobriety checkpoints, undervalues the citizen's interest in freedom from random, unannounced investigatory seizures, and mistakenly assumes that there is "virtually no difference" between a routine stop at a permanent, fixed checkpoint and a

---

(1985) (503 cars stopped, eight arrests, 13 participating officers); *State* v. *Koppel*, 127 N. H. 286, 288, 499 A. 2d 977, 979 (1985) (1,680 vehicles stopped, 18 arrests for driving while intoxicated).

[4] "The then sheriffs of Macomb County, Kalamazoo County, and Wayne County all testified as to other means used in their counties to combat drunk driving and as to their respective opinions that other methods currently in use, e. g., patrol cars, were more effective means of combating drunk driving and utilizing law enforcement resources than sobriety checkpoints." 170 Mich. App. 433, 443, 429 N. W. 2d 180, 184 (1988).

surprise stop at a sobriety checkpoint. I believe this case is controlled by our several precedents condemning suspicionless random stops of motorists for investigatory purposes. *Delaware* v. *Prouse,* 440 U. S. 648 (1979); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975); *United States* v. *Ortiz,* 422 U. S. 891 (1975); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); cf. *Carroll* v. *United States,* 267 U. S. 132, 153–154 (1925).

## I

There is a critical difference between a seizure that is preceded by fair notice and one that is effected by surprise. See *Wyman* v. *James,* 400 U. S. 309, 320–321 (1971); *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 559 (1976); *Michigan* v. *Tyler,* 436 U. S. 499, 513–514 (1978) (STEVENS, J., concurring in part and concurring in judgment). That is one reason why a border search, or indeed any search at a permanent and fixed checkpoint, is much less intrusive than a random stop. A motorist with advance notice of the location of a permanent checkpoint has an opportunity to avoid the search entirely, or at least to prepare for, and limit, the intrusion on her privacy.

No such opportunity is available in the case of a random stop or a temporary checkpoint, which both depend for their effectiveness on the element of surprise. A driver who discovers an unexpected checkpoint on a familiar local road will be startled and distressed. She may infer, correctly, that the checkpoint is not simply "business as usual," and may likewise infer, again correctly, that the police have made a discretionary decision to focus their law enforcement efforts upon her and others who pass the chosen point.

This element of surprise is the most obvious distinction between the sobriety checkpoints permitted by today's majority and the interior border checkpoints approved by this Court in *Martinez-Fuerte.* The distinction casts immediate doubt upon the majority's argument, for *Martinez-Fuerte* is the only case in which we have upheld suspicionless seizures

of motorists. But the difference between notice and surprise is only one of the important reasons for distinguishing between permanent and mobile checkpoints. With respect to the former, there is no room for discretion in either the timing or the location of the stop—it is a permanent part of the landscape. In the latter case, however, although the checkpoint is most frequently employed during the hours of darkness on weekends (because that is when drivers with alcohol in their blood are most apt to be found on the road), the police have extremely broad discretion in determining the exact timing and placement of the roadblock.[5]

There is also a significant difference between the kind of discretion that the officer exercises after the stop is made. A check for a driver's license, or for identification papers at an immigration checkpoint, is far more easily standardized than is a search for evidence of intoxication. A Michigan officer who questions a motorist at a sobriety checkpoint has virtually unlimited discretion to detain the driver on the basis

---

[5] The Michigan plan provides that locations should be selected after consideration of "previous alcohol and drug experience per time of day and day of week as identified by arrests and/or Michigan Accident Location Index data," App. to Pet. for Cert. 148a, and that "specific site selection" should be based on the following criteria:

"1. Safety of the location for citizens and law enforcement personnel. The site selected shall have a safe area for stopping a driver and must afford oncoming traffic sufficient sight distance for the driver to safely come to a stop upon approaching the checkpoint.

"2. The location must ensure minimum inconvenience for the driver and facilitate the safe stopping of traffic in one direction during the pilot program.

"3. Roadway choice must ensure that sufficient adjoining space is available to pull the vehicle off the traveled portion of the roadway for further inquiry if necessary.

"4. Consideration should be given to the physical space requirements as shown in Appendixes 'A' and 'B.'" *Id.*, at 149a–150a.

Although these criteria are not as open-ended as those used in *Delaware* v. *Prouse*, 440 U. S. 648 (1979), they certainly would permit the police to target an extremely wide variety of specific locations.

of the slightest suspicion. A ruddy complexion, an unbuttoned shirt, bloodshot eyes, or a speech impediment may suffice to prolong the detention. Any driver who had just consumed a glass of beer, or even a sip of wine, would almost certainly have the burden of demonstrating to the officer that his or her driving ability was not impaired.[6]

Finally, it is significant that many of the stops at permanent checkpoints occur during daylight hours, whereas the sobriety checkpoints are almost invariably operated at night. A seizure followed by interrogation and even a cursory search at night is surely more offensive than a daytime stop that is almost as routine as going through a tollgate. Thus we thought it important to point out that the random stops at issue in *Ortiz* frequently occurred at night. 422 U. S., at 894.

These fears are not, as the Court would have it, solely the lot of the guilty. See *ante*, at 452. To be law abiding is not necessarily to be spotless, and even the most virtuous can be unlucky. Unwanted attention from the local police need not be less discomforting simply because one's secrets are not the stuff of criminal prosecutions. Moreover, those who have found—by reason of prejudice or misfortune—that encounters with the police may become adversarial or unpleasant without good cause will have grounds for worrying at any stop designed to elicit signs of suspicious behavior. Being stopped by the police is distressing even when it should not be terrifying, and what begins mildly may by happenstance turn severe.

For all these reasons, I do not believe that this case is analogous to *Martinez-Fuerte*. In my opinion, the sobriety checkpoints are instead similar to—and in some respects more intrusive than—the random investigative stops that the Court held unconstitutional in *Brignoni-Ponce* and *Prouse*. In the latter case the Court explained:

---

[6] See, *e. g.*, 1 Record 107.

"We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway and that it bears greater resemblance to a permissible stop and secondary detention at a checkpoint near the border. In this regard, we note that *Brignoni-Ponce* was not limited to roving-patrol stops on limited-access roads, but applied to any roving-patrol stop by Border Patrol agents on any type of roadway on less than reasonable suspicion. See 422 U. S., at 882–883; *United States* v. *Ortiz,* 422 U. S. 891, 894 (1975). We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety." 440 U. S., at 657.

We accordingly held that the State must produce evidence comparing the challenged seizure to other means of law enforcement, so as to show that the seizure

"is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail. On the record before us, that question must be answered in the negative. Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.,* at 659.

## II

The Court, unable to draw any persuasive analogy to *Martinez-Fuerte*, rests its decision today on application of a more general balancing test taken from *Brown* v. *Texas*, 443 U. S. 47 (1979). In that case the appellant, a pedestrian, had been stopped for questioning in an area of El Paso, Texas, that had "a high incidence of drug traffic" because he "looked suspicious." *Id.*, at 49. He was then arrested and convicted for refusing to identify himself to police officers. We set aside his conviction because the officers stopped him when they lacked any reasonable suspicion that he was engaged in criminal activity. In our opinion, we stated:

> "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.*, at 50–51.

The gravity of the public concern with highway safety that is implicated by this case is, of course, undisputed.[7]

---

[7] It is, however, inappropriate for the Court to exaggerate that concern by relying on an outdated statistic from a tertiary source. The Court's quotation from the 1987 edition of Professor LaFave's treatise, *ante*, at 451, is in turn drawn from a 1983 law review note which quotes a 1982 House Committee Report that does not give the source for its figures. See 4 W. LaFave, Search and Seizure § 10.8(d), p. 71 (2d ed. 1987), citing Note, Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures, 71 Geo. L. J. 1457, 1457, n. 1 (1983), citing, H. R. Rep. No. 97–867, p. 7.

JUSTICE BLACKMUN's citation, *ante*, at 455–456 (opinion concurring in judgment) to his own opinion in *Perez* v. *Campbell*, 402 U. S. 637, 657 (1971) (opinion concurring in part and dissenting in part) is even wider of the mark, since that case had nothing to do with drunken driving and the number of highway fatalities has since declined significantly despite the increase in highway usage.

By looking instead at recent data from the National Highway Traffic Safety Administration, one finds that in 1988 there were 18,501 traffic fatalities involving legally intoxicated persons and an additional 4,850 traffic fatalities involving persons with some alcohol exposure. Of course, the

Yet, that same grave concern was implicated in *Delaware* v. *Prouse*. Moreover, I do not understand the Court to have placed any lesser value on the importance of the drug problem implicated in *Brown* v. *Texas* or on the need to control the illegal border crossings that were at stake in *Almeida-Sanchez* and its progeny.[8] A different result in this case must be justified by the other two factors in the *Brown* formulation.

As I have already explained, I believe the Court is quite wrong in blithely asserting that a sobriety checkpoint is no more intrusive than a permanent checkpoint. In my opinion, unannounced investigatory seizures are, particularly when

---

latter category of persons could not be arrested at a sobriety checkpoint, but even the total number of alcohol-related traffic fatalities (23,351) is significantly below the figure located by the student commentator and embraced by today's Court. These numbers, of course, include any accidents that might have been caused by a sober driver but involved an intoxicated person. They also include accidents in which legally intoxicated pedestrians and bicyclists were killed; such accidents account for 2,180 of the 18,501 total accidents involving legally intoxicated persons. The checkpoints would presumably do nothing to intercept tipsy pedestrians or cyclists. See Fatal Accident Reporting System 1988 Overview, p. 1; *id.*, Ch. 2, p. 5; see also 1 Record 58.

[8] The dissents in those cases touted the relevant state interests in detail. In *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 293 (1973), JUSTICE WHITE, joined by the author of today's majority opinion, wrote:

"The fact is that illegal crossings at other than the legal ports of entry are numerous and recurring. If there is to be any hope of intercepting illegal entrants and of maintaining any kind of credible deterrent, it is essential that permanent or temporary checkpoints be maintained away from the borders, and roving patrols be conducted to discover and intercept illegal entrants as they filter to the established roads and highways and attempt to move away from the border area. It is for this purpose that the Border Patrol maintained the roving patrol involved in this case and conducted random, spot checks of automobiles and other vehicular traffic."

Then-JUSTICE REHNQUIST argued in a similar vein in his dissent in *Delaware* v. *Prouse*, in which he observed that:

"The whole point of enforcing motor vehicle safety regulations is to remove from the road the unlicensed driver before he demonstrates why he is unlicensed." 440 U. S., at 666.

they take place at night, the hallmark of regimes far different from ours;[9] the surprise intrusion upon individual liberty is not minimal. On that issue, my difference with the Court may amount to nothing less than a difference in our respective evaluations of the importance of individual liberty, a serious, albeit inevitable, source of constitutional disagreement.[10] On the degree to which the sobriety checkpoint seizures advance the public interest, however, the Court's position is wholly indefensible.

The Court's analysis of this issue resembles a business decision that measures profits by counting gross receipts and ignoring expenses. The evidence in this case indicates that sobriety checkpoints result in the arrest of a fraction of one percent of the drivers who are stopped,[11] but there is absolutely no evidence that this figure represents an increase over the number of arrests that would have been made by using the same law enforcement resources in conventional patrols.[12] Thus, although the *gross* number of arrests is more

[9] "It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

"'These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' *Brinegar* v. *United States,* 338 U. S. 160, 180 [(1949)] (Jackson, J., dissenting)." *Almeida-Sanchez* v. *United States,* 413 U. S., at 273–274.

[10] See, *e. g., Walters* v. *National Assn. of Radiation Survivors,* 473 U. S. 305, 371–372 (1985) (dissenting opinion); *Hudson* v. *Palmer,* 468 U. S. 517, 556–558 (1984) (dissenting opinion); *Meachum* v. *Fano,* 427 U. S. 215, 229–230 (1976) (dissenting opinion).

[11] The Court refers to an expert's testimony that the arrest rate is "around 1 percent," *ante,* at 455, but a fair reading of the entire testimony of that witness, together with the other statistical evidence in the record, points to a significantly lower percentage.

[12] Indeed, a single officer in a patrol car parked at the same place as the sobriety checkpoint would no doubt have been able to make some of the arrests based on the officer's observation of the way the intoxicated driver was operating his vehicle.

than zero, there is a complete failure of proof on the question whether the wholesale seizures have produced any *net* advance in the public interest in arresting intoxicated drivers.

Indeed, the position adopted today by the Court is not one endorsed by any of the law enforcement authorities to whom the Court purports to defer, see *ante*, at 453–454. The Michigan police do not rely, as the Court does, *ante*, at 454–455, on the *arrest rate* at sobriety checkpoints to justify the stops made there. Colonel Hough, the commander of the Michigan State Police and a leading proponent of the checkpoints, admitted at trial that the arrest rate at the checkpoints was "very low." 1 Record 87. Instead, Colonel Hough and the State have maintained that the mere *threat* of such arrests is sufficient to deter drunken driving and so to reduce the accident rate.[13] The Maryland police officer who testified

---

[13] Colonel Hough's testimony included the following exchanges:

"Q. It is true, is it not, Colonel that your purpose in effectuating or attempting to effectuate this Checkpoint Plan is not to obtain large numbers of arrest of drunk drivers?

"A. That is correct.

"Q. Is it correct, is it, as far as you are aware, other states that have tried this have not found they are getting a high rate of arrests?

"A. Yes, that's my understanding.

"Q. What was your purpose then, Colonel, in attempting to implement this plan if you don't intend to use it to get drunk drivers arrested?

"A. Deter them from drinking and driving." App. 77a.

"Q. To your knowledge, in the Maryland study, the part you reviewed, the check lanes are not an effective tool for arresting drunk drivers?

"A. They have not relied upon the number of arrests to judge the successfulness in my understanding." *Id.*, at 82a.

"Q. Are you aware that within the announcements that went out to the public was an indication that the checkpoints were to effectuate or *[sic]* arrest of drunk drivers. There was a goal to effectuate arrests of drunk drivers?

"A. Well, it is part of the role, sure.

"Q. Certainly not your primary goal, is it?

"A. The primary goal is to reduce alcohol related accidents.

"Q. It's not your primary goal by any stretch, is it, to effectuate a high rate of arrests within this program?

at trial took the same position with respect to his State's program.[14]   There is, obviously, nothing wrong with a law enforcement technique that reduces crime by pure deterrence without punishing anybody; on the contrary, such an approach is highly commendable.   One cannot, however, prove its efficacy by counting the arrests that were made. One must instead measure the number of crimes that were avoided.   Perhaps because the record is wanting, the Court simply ignores this point.

The Court's sparse analysis of this issue differs markedly from Justice Powell's opinion for the Court in *Martinez-Fuerte*.   He did not merely count the 17,000 arrests made at the San Clemente checkpoint in 1973, 428 U. S., at 554; he also carefully explained why those arrests represented a net benefit to the law enforcement interest at stake.[15]   Common

---

"A. No.

"Q. If your goal was to effectuate a rise of arrests, you would use a different technique, wouldn't you?

"A. I don't know that."   1 Record 88–89.

Respondents informed this Court that at trial "the Defendants did not even attempt to justify sobriety roadblocks on the basis of the number of arrests obtained."   Brief for Respondents 25.   In answer, the State said: "Deterrence and public information are the primary goals of the sobriety checkpoint program, but the program is also clearly designed to apprehend any drunk drivers who pass through the checkpoint."   Reply Brief for Petitioner 34.   This claim, however, does not directly controvert respondents' argument or Colonel Hough's concession: Even if the checkpoint is designed to produce some arrests, it does not follow that it has been adopted in order to produce arrests, or that it can be justified on such grounds.

[14] "Dr. Ross' testimony regarding the low actual arrest rate of checkpoint programs was corroborated by the testimony of one of defendants' witnesses, Lieutenant Raymond Cotten of the Maryland State Police." 170 Mich. App., at 442, 429 N. W. 2d, at 184.

[15] "Our previous cases have recognized that maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border.   We note here only the substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints, a practice which the Government identi-

sense, moreover, suggests that immigration checkpoints are more necessary than sobriety checkpoints: There is no reason why smuggling illegal aliens should impair a motorist's driving ability, but if intoxication did not noticeably affect driving ability it would not be unlawful. Drunken driving, unlike smuggling, may thus be detected absent any checkpoints. A program that produces thousands of otherwise impossible arrests is not a relevant precedent for a program that produces only a handful of arrests which would be more easily obtained without resort to suspicionless seizures of hundreds of innocent citizens.[16]

---

fies as the most important of the traffic-checking operations. Brief for United States in No. 74-1560, pp. 19-20. These checkpoints are located on important highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior. Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb to the lure of such highways. And the prospect of such inquiries forces others onto less efficient roads that are less heavily traveled, slowing their movement and making them more vulnerable to detection by roving patrols. Cf. *United States* v. *Brignoni-Ponce*, 422 U. S., at 883-885.

"A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens. In particular, such a requirement would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly." 428 U. S., at 556-557 (footnote omitted).

[16] Alcohol-related traffic fatalities are also susceptible to reduction by public information campaigns in a way that crimes such as, for example, smuggling or armed assault are not. An intoxicated driver is her own most likely victim: More than 55 percent of those killed in accidents involving legally intoxicated drivers are legally intoxicated drivers themselves. Fatal Accident Reporting System 1988 Overview, p. 1. Cf. *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 634 (STEVENS, J., concurring in part and concurring in judgment) ("[I]f they are conscious of the possibilities that such an accident might occur and that alcohol or drug use might be a contributing factor, if the risk of serious personal injury does not deter their use of these substances, it seems highly unlikely that the

## III

The most disturbing aspect of the Court's decision today is that it appears to give no weight to the citizen's interest in freedom from suspicionless unannounced investigatory seizures. Although the author of the opinion does not reiterate his description of that interest as "diaphanous," see *Delaware v. Prouse*, 440 U. S., at 666 (REHNQUIST, J., dissenting), the Court's opinion implicitly adopts that characterization. On the other hand, the Court places a heavy thumb on the law enforcement interest by looking only at gross receipts instead of net benefits. Perhaps this tampering with the scales of justice can be explained by the Court's obvious concern about the slaughter on our highways and a resultant tolerance for policies designed to alleviate the problem by "setting an example" of a few motorists. This possibility prompts two observations.

First, my objections to random seizures or temporary checkpoints do not apply to a host of other investigatory procedures that do not depend upon surprise and are unquestionably permissible. These procedures have been used to address other threats to human life no less pressing than the threat posed by drunken drivers. It is, for example, common practice to require every prospective airline passenger, or every visitor to a public building, to pass through a metal detector that will reveal the presence of a firearm or an explosive. Permanent, nondiscretionary checkpoints could be used to control serious dangers at other publicly operated facilities. Because concealed weapons obviously represent one such substantial threat to public safety,[17] I would suppose

---

additional threat of loss of employment would have any effect on their behavior").

[17] For example, in 1988 there were 18,501 traffic fatalities involving legally intoxicated persons. If one subtracts from this number the 10,210 legally intoxicated drivers who were *themselves* killed in these crashes, there remain 8,291 fatalities in which somebody other than the intoxicated driver was killed in an accident involving legally intoxicated persons (this

that all subway passengers could be required to pass through metal detectors, so long as the detectors were permanent and every passenger was subjected to the same search.[18] Likewise, I would suppose that a State could condition access to its toll roads upon not only paying the toll but also taking a uniformly administered breathalyzer test. That requirement might well keep all drunken drivers off the highways that serve the fastest and most dangerous traffic. This procedure would not be subject to the constitutional objections that control this case: The checkpoints would be permanently fixed, the stopping procedure would apply to all users of the toll road in precisely the same way, and police officers would not be free to make arbitrary choices about which neighborhoods should be targeted or about which individuals should be more thoroughly searched. Random, suspicionless seizures designed to search for evidence of firearms, drugs, or intoxication belong, however, in a fundamentally different category. These seizures play upon the detained individual's reasonable expectations of privacy, injecting a suspicionless search into a context where none would normally occur. The imposition that seems diaphanous today may be intolerable tomorrow. See *Boyd* v. *United States*, 116 U. S. 616, 635 (1886).

---

number still includes, however, accidents in which legally intoxicated pedestrians stepped in front of sober drivers and were killed). Fatal Accident Reporting System 1988 Overview, p. 1; see also n. 15, *supra.*

By contrast, in 1986 there were a total of 19,257 murders and non-negligent manslaughters. Of these, approximately 11,360 were committed with a firearm, and another 3,850 were committed with some sort of knife. U. S. Dept. of Justice, 1987 Sourcebook of Criminal Justice Statistics 337 (1988).

From these statistics, it would seem to follow that someone who does not herself drive when legally intoxicated is more likely to be killed by an armed assailant than by an intoxicated driver. The threat to life from concealed weapons thus appears comparable to the threat from drunken driving.

[18] Permanent, nondiscretionary checkpoints are already a common practice at public libraries, which now often require every patron to submit to a brief search for books, or to leave by passing through a special detector.

Second, sobriety checkpoints are elaborate, and disquieting, publicity stunts. The possibility that anybody, no matter how innocent, may be stopped for police inspection is nothing if not attention getting. The shock value of the checkpoint program may be its most effective feature: Lieutenant Cotten of the Maryland State Police, a defense witness, testified that "the media coverage . . . has been absolutely overwhelming . . . . Quite frankly we got benefits just from the controversy of the sobriety checkpoints."[19] In-

---

[19] 2 Record 40. Colonel Hough and Lieutenant Cotten agreed that publicity from the news media was an integral part of the checkpoint program. Colonel Hough, for example, testified as follows:

"Q. And you have observed, haven't you, Colonel, any time you have a media campaign with regard to a crackdown you're implementing, it does have a positive effect?

"A. We believe it has an effect, yes.

"Q. And in order for the positive effect of the media campaign to continue would be necessary to continue the announcements that you are putting out there?

"A. Yes.

"Q. It's true, isn't it, much of the media publicity attendant to this sobriety checkpoint has come from your public service announcements about the general media attention to this issue and placing it in our newspapers as a public interest story?

"A. Yes. . . .

"Q. Or other television public interest stories?

"A. Yes.

"Q. You don't anticipate, do you, Colonel, that the level of media interest in this matter will continue over the long haul, do you?

"A. I am certain it will wane in a period of time.

"Q. Have you ever given any thought to whether or not a different type of deterrent program with the same type of attendant media attention would have a similar deterrent effect as to what you can expect at the checkpoint?

"A. We have done it both with a SAVE Program and CARE Program and selective enforcement. Probably it has not received as great of attention as this has.

"Q. Any question, have you ever given any thought to whether or not a different technique with the same attendant media publicity that this has gotten would have the same effect you're looking for here?

476 as the State seeks to justify its use of sobriety check-points on the basis that they dramatize the public interest in the prevention of alcohol-related accidents, the Court should heed JUSTICE SCALIA's comment upon a similar justification for a drug screening program:

"The only plausible explanation, in my view, is what the Commissioner himself offered in the concluding sentence of his memorandum to Customs Service employees announcing the program: 'Implementation of the drug screening program would set an important example in our country's struggle with this most serious threat to our national health and security.' App. 12. Or as respondent's brief to this Court asserted: 'if a law enforcement agency and its employees do not take the law seriously, neither will the public on which the agency's effectiveness depends.' Brief for Respondent 36. What better way to show that the Government is serious about its 'war on drugs' than to subject its employees on the front line of that war to this invasion of their privacy and affront to their dignity? To be sure, there is only a slight chance that it will prevent some serious public harm resulting from Service employee drug use, but it will show to the world that the Service is 'clean,' and—most important of all—will demonstrate the determination of the Government to eliminate this scourge of our society! I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism,

"A. No." 1 *id.*, at 91–92.

In addition, Point 6 of the Michigan State Police Sobriety Checkpoint Guidelines indicates that each driver stopped should be given a brochure describing the checkpoint's purposes and operation. "The brochure will explain the purpose of the sobriety checkpoint program, furnish information concerning the effects of alcohol and safe consumption levels, and include a detachable pre-addressed questionnaire." Trial Exhibit A, Michigan State Police Sobriety Checkpoint Guidelines 8 (Feb. 1986). The Maryland program had a similar feature. 2 Record 18.

even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search." *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 686–687 (1989) (dissenting opinion).

This is a case that is driven by nothing more than symbolic state action—an insufficient justification for an otherwise unreasonable program of random seizures. Unfortunately, the Court is transfixed by the wrong symbol—the illusory prospect of punishing countless intoxicated motorists—when it should keep its eyes on the road plainly marked by the Constitution.

I respectfully dissent.