787 So.2d 208 (2001)
David James RINALDO, Appellant,
v.
STATE of Florida, Appellee.
No. 4D98-4437.
District Court of Appeal of Florida, Fourth District.
May 16, 2001.
Rehearing Denied July 9, 2001.
*209 Gene Reibman, Fort Lauderdale, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, Susan Odzer Hugentugler, Assistant Attorney General, Fort Lauderdale, and Sarah B. Mayer, Assistant Attorney General, West Palm Beach, for appellee.
TAYLOR, J.
David Rinaldo appeals his judgments of conviction for carrying a concealed firearm and driving under the influence (DUI). We affirm on all issues raised by appellant but write to address his contention that the trial court erred in denying his motion to suppress evidence gathered at a DUI roadblock.
Before trial, appellant moved to suppress physical evidence and statements obtained during his arrest at a DUI roadblock. The trial court denied his motion, and, following a jury trial, appellant was convicted as charged. On appeal, he contends that the trial court erred in denying his motion to suppress on several grounds. First, he argues that the roadblock failed to comply with the requirements of State v. Jones, 483 So.2d 433 (Fla.1986), and Campbell v. State, 679 So.2d 1168 (Fla. 1996), in that the written guidelines did not specifically address detention techniques governing the roadblock encounter. Second, appellant argues that the police lacked reasonable suspicion to detain and question him during the roadblock stop and to order him out of his vehicle. Third, appellant argues that the officer lacked authority to arrest him outside of his jurisdiction.

BACKGROUND
On August 30, 1997, appellant was arrested at the scene of a DUI checkpoint in *210 Cooper City. The checkpoint was operated by police officers from various Broward municipalities who formed a DUI task force under a Mutual Aid Agreement. Cooper City officers set up the roadblock, using cones, signs, and flashing lights to alert the public, and created a deceleration area for vehicles to flow from multiple traffic lanes into one lane of traffic.
Cooper City Police Officer Petosky, who was the point man at the roadblock, signaled appellant to stop in the checkpoint area. Appellant did not stop but drove slowly past Petosky. City of Hallandale Police Officer Williams, who was participating in the checkpoint, saw appellant roll past Petosky and pulled appellant over. Williams approached the driver's side of appellant's Ford pickup truck. Because appellant's window was darkly tinted and just partially open, Williams could see only the top of appellant's head.[1] He asked appellant to roll down the window or open the door. When appellant did neither, the officer became concerned for his safety and opened the door to appellant's vehicle himself. The officer attempted to step in toward the door to prevent appellant from closing it, but appellant reached past the officer and pulled the door shut. Williams opened the door again and positioned himself to keep it open. He then asked appellant for his driver's license, registration, and proof of insurance. After some delay, appellant provided his driver's license, while placing a small hand-held tape recorder near the officer's face. He produced his registration and insurance after a second request for those documents.
The front passenger became very "vocal" and heightened the officer's concern for his safety. Williams then asked appellant to step outside his truck and directed him to the back of the vehicle. As appellant exited the truck, the officer noticed that appellant slid down his seat and used the door handle for support. When appellant walked to the back of the truck, he held onto the side of the truck and seemed unsteady. The officer attempted to question appellant but appellant refused to respond. While standing near appellant at the back of the truck, the officer observed that appellant had an odor of alcohol on his breath and that his eyes were bloodshot, his face was flushed, and his speech was slurred. Based on these observations, Williams arrested appellant for driving under the influence.
During a search incident to appellant's arrest, the officer discovered a fully loaded.22 caliber handgun in appellant's back pocket. He asked appellant if he had a concealed weapon's permit. Appellant responded that he did and produced a "United States of America Concealed Firearms Declaration." On the back, the document stated that it was not a legal permit for carrying concealed weapons. Appellant was arrested for carrying a concealed firearm, DUI, resisting arrest without violence, and no proof of insurance. Officer Williams transported appellant to the interview area, where he read appellant the Florida Implied Consent law and asked him to take a breath or blood alcohol test. Appellant refused to submit to alcohol testing or to perform any sobriety tests on video.
Sergeant Jacob Saredy of the Cooper City Police Department was in charge of the checkpoint on the night of appellant's arrest. At the suppression hearing, he testified about the advance planning, preparation, and implementation of the DUI checkpoint. He said that about fifty officers *211 were involved in the DUI checkpoint pursuant to a Mutual Aid Agreement. Through Saredy, the state introduced into evidence the "Mutual Aid Agreement" and the "Sobriety Checkpoint Standard Operating Procedure" used for the roadblock operation. The state also introduced the memorandum from Saredy's supervisor regarding the need for a DUI checkpoint; the media release issued by the Cooper City Police Department; and fax cover sheets identifying recipients of the release.
The trial court denied appellant's motion to suppress, concluding that the DUI checkpoint met the requirements of Jones and that the Mutual Aid Agreement authorized Officer Williams to arrest appellant outside of his jurisdiction.

MOTION TO SUPPRESS

Written Guidelines for Roadblock
Appellant argues that the roadblock was invalid because it did not meet the particularized advance planning and strict compliance standards of Jones and Campbell. Specifically, appellant challenges the failure of the roadblock guidelines to address detention procedures to be followed by police upon encountering a motorist, who, like appellant, fails to fully cooperate and comply with roadblock commands. He complains that Officer Williams's "aggressive approach" in opening his car door and ordering him outside the vehicle exceeded the written guidelines and violated his Fourth Amendment rights.
In Jones, the Florida Supreme Court held that a written set of uniform guidelines must be issued before a roadblock can be utilized. The court explained that "[b]ecause DUI roadblocks involve seizures made without any articulable suspicion of illegal activity," an advance plan with neutral and specific criteria is necessary to limit the amount of police officer discretion and reduce the risk of abuse. The court noted that "[i]deally, these guidelines should set out with reasonable specificity procedures regarding the selection of vehicles, detention techniques, duty assignments, and the disposition of vehicles." 483 So.2d at 438 (emphasis supplied). However, the court went on to say that "if the guidelines fail to cover each of these matters they need not necessarily fail. Rather, courts should view each set of guidelines as a whole when determining the plan's sufficiency." Id.
In assessing the sufficiency of sobriety checkpoint plans, courts generally focus upon the amount of discretion police officers at the scene are allowed to exercise. This is because limiting field officer discretion is the main objective underlying Jones's requirement that roadblocks be carried out pursuant to a previously established and neutral plan. In this case, the written guidelines were comprised of the Cooper City Police Department's "Sobriety Checkpoint Standard Operating Procedure," which delineated general checkpoint procedures, and the "D.U.I. Checkpoint Operational Plan Assignments," which addressed conduct of this particular roadblock. The sole motive of the checkpoint was to detect and apprehend drunk drivers. To accomplish that goal in a neutral and uniform manner, the guidelines established specific duties and procedures to be followed by officers participating in the roadblock.
The pointman's job was to count and direct vehicles into the interview area in a nondiscretionary sequence, as provided in the written guidelines, and as determined by Sergeant Saredy, depending on traffic conditions. The uniformed officers were briefed prior to the checkpoint and provided with a suggested script for questioning the drivers stopped in the roadblock. Once a vehicle was directed into the interview area, the officers were to briefly detain *212 the driver to identify themselves, explain the purpose of the roadblock, and request a driver's license and registration. They were to also observe the driver and check for signs of impairment, and if no impairment was detected, allow the driver to continue on his or her way. If it appeared to the officer that a driver was under the influence of alcohol, he was to direct the driver to an interview area for further DUI investigation.
Although, as appellant points out, the guidelines were silent on directions for dealing with an encounter like the one between Officer Williams and appellant, we do not consider this deficiency a fatal flaw. The written instructions, which focused on procedures to be followed during the initial stop and detention of motorists, were clear and reasonable and did not permit random or arbitrary vehicle stops or allow officers to discriminately target particular persons. Every encounter with a stopped vehicle included a request for documentation and some preliminary questioning and observation for signs of alcohol impairment. Although an "ideal" set of guidelines would anticipate that a motorist might refuse to cooperate with police during a roadblock operation, a plan that does not cover such an occurrence is not per se constitutionally invalid. Motorists are neither expected nor privileged to refuse to obey these minimal necessary and legitimate demands at a valid roadblock. As the Jones court said:
The public, however, must keep in mind that the privilege of driving an automobile over public highways does not amount to an absolute organic right. Our government provides the roadways of Florida as a benefit to the public at large. Accordingly, this state retains extensive authority to safeguard the driving public via its police power. If the holder of a driver's license cannot utilize the privilege of driving on our public streets and highways in a careful manner and respect the rights of others to do likewise, that driver becomes a public nuisance and should be either temporarily or permanently excluded from those roads. In order to safeguard Floridians against such drivers, motorists should reasonably accept the minor inconvenience which they may endure at a properly run DUI roadblock.
438 So.2d at 438 (citations omitted).
Moreover, as the state points out, a driver who is lawfully stopped for a DUI checkpoint is under a legal obligation to respond to an officer's requests for certain information and documents, and the driver's refusal to respond to these requests may constitute the misdemeanor offense of obstructing or opposing an officer. See § 843.02, Fla. Stat. (1991). See also Burkes v. State, 719 So.2d 29 (Fla. 2d DCA 1998); K.A.C. v. State, 707 So.2d 1175 (Fla. 3d DCA 1998); In the Interest of J.H., 559 So.2d 702 (Fla. 4th DCA 1990); M.C. v. State, 450 So.2d 336 (Fla. 5th DCA 1984). If a driver engages in obstructive conduct, in violation of section 843.02, then standard police detention and arrest procedures, rather than checkpoint guidelines, would govern the officer's handling of the situation.
Thus, viewing these guidelines "as a whole" in determining the plan's sufficiency, we conclude that the guidelines set out the detention techniques with reasonable specificity and limited the discretion of police officers at the scene in a manner consistent with Jones and Campbell.

Initial Roadblock Encounter
Our above discussion leads into appellant's next argument that, even assuming that the roadblock was lawful, the police lacked reasonable suspicion to detain and question him during the roadblock stop. Appellant maintains that he was not obligated *213 to interact with the officer or respond to his questions. He reasons that, because DUI roadblocks result in stops without any founded suspicion, they are a species of consensual encounters. Thus, he argues, a citizen is free to ignore the officer's directions and refuse to answer any of his questions. Appellant cites Popple v. State, 626 So.2d 185 (Fla.1993), for the proposition that, during a consensual encounter, a citizen may either voluntarily comply with an officer's request or choose to ignore them.
However, as the United States Supreme Court acknowledged in Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), "a Fourth Amendment seizure occurs when a vehicle is stopped at a checkpoint." See also Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)("[S]topping an automobile and detaining its occupants constitute a `seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief."). A roadblock stop, just like a Terry stop, is a seizure imposing a greater intrusion upon a citizen than a consensual encounter. Unlike a Terry stop, however, its validity turns not upon a reasonable suspicion but upon "a showing that officers carry out the search pursuant to a plan embodying specific neutral criteria which limits the conduct of the individual officers." Jones, 483 So.2d at 438. As we stated above, the guidelines and operational plan used for conducting this DUI checkpoint met the required showing. Accordingly, appellant enjoyed no Popple privilege to ignore the officer's request for documents or to thwart the officer's ability to observe him for signs of impairment.

Detention Outside Vehicle
Appellant next argues that although the initial stop may have been valid pursuant to a lawful DUI checkpoint, the officer lacked reasonable suspicion to detain him beyond the initial stop and to order him from his vehicle. He asserts that once Officer Williams opened his car door and inspected his driving documents, the officer was able to "eyeball" him for signs of impairment and satisfy the purpose of the initial stop. He argues that his continued detention, without reasonable suspicion, violated the Fourth Amendment and led to evidence, including observations of his state of sobriety and statements, which should have been suppressed.
We agree with appellant that the detention of a motorist for a more extensive investigation requires satisfaction of "an individualized reasonable suspicion standard." See Sitz, 496 U.S. at 451, 110 S.Ct. 2481. However, we do not agree that the circumstances surrounding the roadblock stop in this case were insufficient to provide the officer with reasonable suspicion that appellant was engaged in criminal activity.[2] As we stated earlier, motorists are obligated to comply with an officer's reasonable requests at a valid roadblock and must "accept the minor inconvenience which they may endure." *214 Jones, 483 So.2d at 438. Refusing to interact with an officer and allow the officer an opportunity to observe the driver for signs of impairment defeats or frustrates the very purpose of the roadblock, i.e., to detect impaired drivers. Here, appellant's conduct both before and during the roadblock was sufficient to raise reasonable suspicion that he was engaged in criminal activity, i.e., obstructing or attempting to obstruct or oppose an officer during the lawful execution a duty. Officer Williams observed appellant drive past the roadblock without stopping and then refuse to roll down his window or open his door when approached. Appellant insisted on keeping his door closed, even after Williams opened it, leading the officer to believe that appellant was trying to prevent him from having a clear view inside his vehicle. In addition, appellant hesitated in handing over his driving documents and appeared, along with his "vocal" passenger, to be deliberately interfering with the officer's performance of his roadblock duties. These circumstances gave the officer reason to believe that appellant was engaged in obstructive conduct. They additionally gave the officer reason to fear for his safety and to order appellant out of his vehicle.
In Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court held that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle. Mimms balanced the public interest in officer safety against the driver's personal liberty rights, concluding that the "legitimate and weighty" interest in protecting the officer's safety against criminal attacks outweighed the de minimis intrusion to a driver already lawfully stopped. 434 U.S. at 110, 98 S.Ct. 330. See also Doctor v. State, 573 So.2d 157 (Fla. 4th DCA 1991)(following Mimms and holding that "when a police officer lawfully stops a car for a traffic infraction, his order to the driver or passenger to get out of the car is reasonable and permissible under the Fourth Amendment even though at the time of the stop the officer has no reason to suspect foul play from the particular driver or passenger").
Mimms, however, is distinguishable from this case in that it involved a traffic stop that was based on a traffic violation, rather than a DUI checkpoint. Reasonable suspicion, according to Popple, is necessary for a police officer to order an occupant to exit his vehicle. Id., 626 So.2d at 187 (an officer's direction for one to exit his vehicle is a seizure requiring reasonable suspicion for detention). Thus, while we do not conclude that the bright line rule in Mimms applies to a routine roadblock stop, we hold that where an officer, after conducting a valid roadblock stop, develops reasonable suspicion that the driver has committed or is committing a criminal or traffic violation, the officer may lawfully order the driver to get out of the vehicle.

Arrest Outside Jurisdiction
Finally, we agree with the trial court's determination that the Mutual Aid Agreement entered into evidence permitted Hallandale Police officers to assist the Cooper City Police Department in conducting a sobriety checkpoint and authorized Officer Williams to arrest appellant outside his jurisdiction.[3]

*215 CONCLUSION

Based on the foregoing, we find no error in the trial court's denial of appellant's motion to suppress.
AFFIRMED.
WARNER, C.J., and LENDERMAN, JOHN C., Associate Judge, concur.
NOTES
[1] The top of appellant's truck was approximately six feet and three inches off the ground.
[2] There appears to be no controlling precedent in Florida law that directly addresses the issue of whether a driver's uncooperative behavior during a roadblock furnishes reasonable suspicion that the driver is committing a criminal or traffic violation. We note, however, that a number of courts in other jurisdictions have determined that a driver's mere attempt to avoid a roadblock is sufficient to give rise to a reasonable suspicion that the driver was engaged in some form of criminal activity. See, e.g., Brown v. Com., 17 Va.App. 694, 440 S.E.2d 619 (1994); State v. Thill, 474 N.W.2d 86 (S.D.1991); Com. v. Frombach, 420 Pa.Super. 498, 617 A.2d 15 (1992); Coffman v. State, 26 Ark.App. 45, 759 S.W.2d 573 (1988); Smith v. State, 515 So.2d 149 (Ala.Crim.App.1987).
[3] The Mutual Aid Agreement entered into by the different law enforcement agencies in Broward County provides, in its preamble:

The undersigned Governmental Entities in Broward County, Florida together establish this mutual aid agreement pursuant to Section 23.1225(1), (2), Florida Statute, known as the Florida Mutual Aid Act. In accord with the authority granted therein, the jurisdictions agree to the following agreement covering voluntary cooperation and operational assistance. The agreement provides for law enforcement activities across jurisdictional lines in certain defined circumstances for the purpose of protecting the public peace and safety and preserving the lives and property of the citizens of each Governmental entity.
(Emphasis supplied).
Under the heading "Operational Assistance," the agreement states:
The undersigned Governmental Entities recognize that special public safety problems arise on an occasional basis that require additional law enforcement personnel. The following operational assistance agreement is created to provide the Governmental Entities a way to give and receive aid.
The Operational Assistance portion of the agreement permits an agency to request aid from a participating agency "for special events and conditions that occur for extended periods of time" and provides that the assistance may include patrol services.