COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Bumgardner and Agee
Argued at Salem, Virginia


DARNELL ANTHONY WESLEY

                                              OPINION BY
v.    Record No. 2246-00-3        JUDGE JERE M. H. WILLIS, JR.
                                            NOVEMBER 13, 2001
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF AMHERST COUNTY
                       J. Michael Gamble, Judge

         Lisa W. Vogel for appellant.

         Donald E. Jeffrey, III, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         brief), for appellee.


     On appeal from his bench trial conviction of driving while

under the influence of alcohol, in violation of Code § 18.2-266,

Darnell Anthony Wesley contends that the trial court erred in

denying his motion to suppress the evidence derived from

stopping his vehicle.  He argues that the traffic checkpoint at

which he was stopped was established unconstitutionally.

Finding no error, we affirm the judgment of the trial court.

                        I.   BACKGROUND

     On April 23, 2000, the Virginia State Police established

the questioned checkpoint on Route 60 in Amherst County.  State

Trooper J.W. Ratliff testified that he was assigned to the

checkpoint with two other officers and that the location was established at the direction of Sergeant R.J. Shupe. Ratliff testified that this was done pursuant to state police guidelines and a "site plan" approved by a supervisor.

The State Police Traffic Checking Detail/DUI Sobriety Checkpoint Plan (State Plan), which provides guidelines for establishing checkpoints in Virginia, was admitted into evidence. The purpose of the State Plan is "to enforce driver's license and vehicle registration laws" and to address "all other violations of the law coming to the attention of our sworn employees." Under the State Plan, field officers must obtain pre-approval from a supervisor before instituting a checking detail. The plan provides that vehicles "will not be stopped on a discretionary basis." It limits the duration of checkpoints to "no less than 30 minutes and no more than two hours." It provides that the number of employees should be "in proportion to the volume of traffic." It provides that the site location should have adequate visibility for safety, have adequate off-pavement parking, and should not have hazardous characteristics or include highways where speed or traffic conditions would pose a safety threat. Trooper Ratliff testified that the Route 60 site was one of the Amherst County sites approved in accordance with these requirements.

The Amherst County Checking Detail Site Plan (Amherst Plan) was admitted into evidence. It provides, in pertinent part:

> All vehicles will be screened unless a back-up of (1) more than 20 vehicles occurs in any lane of travel or (2) vehicles back-up more than 400 feet from the designated checking point. The first alternate method will be to check every 2nd vehicle. The second alternate method will be to check every 4th vehicle. If back-ups continue, the operation will be ceased. The method used will be noted on Form SP-99.

The Amherst Plan requires a minimum of two officers to conduct a checkpoint.

Form SP-99 (the Activity Sheet) was admitted into evidence. It states that Sergeant Shupe gave "verbal" approval for a checkpoint at the Route 60 site on April 23, 2000. It further states that the three troopers, Trooper Ratliff, Trooper J.D. Scott, and Trooper G.S. Cash, began the checkpoint at 7:00 p.m. and ended it at 8:30 p.m. They checked all ninety-five vehicles that passed through the checkpoint that evening.

At approximately 7:20 p.m., Wesley stopped his vehicle at the checkpoint. Upon detecting "an odor of alcoholic beverage coming from the vehicle," Trooper Ratliff asked Wesley to perform a series of "field sobriety tests." Based upon the results of his efforts, Wesley was arrested for driving under the influence of alcohol. An analysis of his breath revealed a blood alcohol concentration of .09 grams/210 liters.

Wesley moved to suppress all evidence derived from the stopping of his vehicle. He argued that the State Plan gave

unbridled discretion to the field officers to terminate the checkpoint at any time between thirty minutes and two hours and did not adequately define "back-ups," thus giving them unbridled discretion in determining whom to stop.  He further argued that the checkpoint location provided inadequate parking and that an insufficient number of officers manned the checkpoint.

The trial court denied the motion, admitted the evidence, and convicted Wesley.

## II.  CONSTITUTIONALITY OF THE STATE PLAN

Wesley first contends that the State Plan and the Amherst Plan, as written, are unconstitutional because they vest unbridled discretion in the field officers.

The statutory right of a law enforcement officer to stop a motor vehicle and the obligation of a motor vehicle operator to stop at a traffic checkpoint are circumscribed by Delaware v. Prouse, 440 U.S. 648 (1979).  In Prouse, the United States Supreme Court held unconstitutional the random stopping of motor vehicles, other than upon the basis of probable cause or reasonable suspicion of criminal activity.  See id. at 662.  The Court ruled that a person "operating or traveling in an automobile does not lose all reasonable expectation of privacy

simply because the automobile and its use are subject to

government regulation." Id. However, the Court went on to say:

> This holding does not preclude the . . .
> states from developing methods for spot
> checks that involve less intrusion or that
> do not involve the unconstrained exercise of
> discretion. Questioning of all oncoming
> traffic at roadblock-type stops is one
> possible alternative. We hold only that
> persons in automobiles on public roadways
> may not for that reason alone have their
> travel and privacy interfered with at the
> unbridled discretion of police officers.

Id. at 663.

In Brown v. Texas, 443 U.S. 47 (1979), the United States

Supreme Court set forth a balancing test for determining the

validity of a traffic stop based on less than probable cause or

"articulable and reasonable suspicion" of criminal activity.

The test involves weighing (1) the gravity of the public

concerns served by the seizure, (2) the degree to which the

seizure advances the public interest, and (3) the severity of

the interference with individual liberty. See id. at 50-51.

Noting the central constitutional concern that "an individual's

reasonable expectation of privacy is not subject to arbitrary

invasions solely at the unfettered discretion of officers in the

field," the Court said, "the Fourth Amendment requires that a

seizure must be based on specific, objective facts indicating

that society's legitimate interests require the seizure of the

particular individual, or that the seizure must be carried out

pursuant to a plan embodying explicit, neutral limitations on

the conduct of individual officers." Id. at 51. See also Lowe

v. Commonwealth, 230 Va. 346, 337 S.E.2d 273 (1985).

Lowe involved an arrest made at a license and sobriety

checkpoint conducted pursuant to Charlottesville's checkpoint

plan. Analyzing the plan under the criteria set forth in Brown,

the Virginia Supreme Court held:

> Balancing the State's strong interest in
> protecting the public from the grave risk
> presented by drunk drivers, against the
> minimal inconvenience caused motorists
> approaching the roadblock, we hold that the
> action of the police in this case was not an
> impermissible infringement upon defendant's
> reasonable expectation of privacy. The
> Charlottesville system is safe and objective
> in its operation, employs neutral criteria,
> and does not involve standardless, unbridled
> discretion by the police officer in the
> field, which was condemned in Prouse.

Lowe, 230 Va. at 352, 337 S.E.2d at 277.

In Simmons v. Commonwealth, 238 Va. 200, 380 S.E.2d 656

(1989), the Virginia Supreme Court considered a license and

registration checkpoint established and conducted by two state

troopers on their own initiative. The troopers stopped and

inspected every vehicle passing through the checkpoint. Holding

the checkpoint to be constitutionally impermissible, the Court

said:

> We do not read Prouse to stand for the
> proposition that stopping all traffic at a
> roadblock constitutes sufficient restraint
> on the exercise of discretion by police
> officers to transform the stop into a
> constitutionally valid roadblock. While
> this approach may eliminate the
> constitutional vice inherent in a random
> spot check or stop and therefore be a

> preferred practice, . . . the roadblock also must be undertaken pursuant to an explicit plan or practice which uses neutral criteria and limits the discretion of the officers conducting the roadblock. The evidence in this case establishes that the decision to establish the roadblock as well as its location and duration was solely within the discretion of the troopers. No advance approval or authorization from any supervisor or superior officer was required to set up the roadblock.

Id. at 203-04, 380 S.E.2d at 658-59 (footnote omitted).

The requirements of the State Plan and the Amherst Plan satisfied the criteria set forth in Brown, the standards approved in Lowe, and the requirement of Simmons. The only element left to the field officers' judgment was the duration of the checkpoint. The State Plan provides that checkpoints will last not less than thirty minutes nor more than two hours. This flexibility is necessary to accommodate weather, general traffic conditions, the availability of personnel and the performance of other necessary police functions. The plan does not afford the field officers the "unbridled discretion" forbidden by Brown, Lowe, and Simmons. While not deciding the specific point, we have heretofore approved the State Plan containing that element of discretion. See Crouch v. Commonwealth, 26 Va. App. 214, 494 S.E.2d 144 (1997). Thus, in no respect was the establishment of the checkpoint left to the unbridled discretion of the field officers. Therefore, we hold that establishment of the checkpoint pursuant to the State Plan and the Amherst Plan was

constitutional and that the discretion afforded the officers to conduct the checkpoint for not less than thirty minutes nor more than two hours did not render the activity unconstitutional.

### III.  IMPLEMENTATION OF CHECKPOINT

Wesley next contends that the field officers deviated from the State Plan and the Amherst Plan, rendering the checkpoint unreasonable and constitutionally impermissible.

We have held previously that when the police have adopted a plan for conducting a traffic checkpoint, the field officers have no discretion to deviate from the plan.  See Brown v. Commonwealth, 20 Va. App. 21, 25, 454 S.E.2d 758, 759 (1995). It is in this light that we view Wesley's challenges to the operation of the checkpoint.

### A.  MINIMUM PERSONNEL

Wesley first contends that the checkpoint was operated by an insufficient number of officers.

The State Plan requires that the number of employees assigned to a checkpoint should be "in proportion to the volume of traffic."  The Amherst Plan requires a minimum of two officers.  Trooper Ratliff testified that three officers were at the checkpoint until he left with Wesley.  When he left, two officers remained.  This satisfied both the State Plan and the Amherst Plan.

## B. SAFE LOCATION

Wesley next contends that the checkpoint was not operated safely because it lacked adequate parking for the police and any violators. The record does not support this contention.

The Amherst Plan established that visibility was "good" at the location and that the site involved no hazardous characteristics. Nothing in the record suggests that the checkpoint itself was unsafe or that it was conducted unsafely.

## C. STARTING TIME

Finally, Wesley contends that the checkpoint did not begin at 7:00 p.m., the time approved by the state police supervisor. He states correctly that the videotape of Trooper Ratliff's contact with him shows the time to be just after 6:00 p.m., which would have been before the checkpoint was authorized to begin. Trooper Ratliff, however, testified that the "time was in fact 7:10 [p.m.]." He further testified that the videotape "may not have been" adjusted for daylight savings time. The resolution of this disparity lay within the judgment of the trial court. The evidence supports its conclusion that the stop occurred within the authorized time frame of the checkpoint.

## IV. CONCLUSION

Because the State Plan and the Amherst Plan passed constitutional muster and because the officers conducted the checkpoint in compliance with those plans, Wesley's seizure did not contravene the protections of the Fourth Amendment.

Accordingly, the trial court did not err in denying Wesley's motion to suppress.  The judgment of the trial court is affirmed.

<u>Affirmed.</u>