502

## CIRCUIT COURT OF ROCKINGHAM COUNTY

Commonwealth of Virginia

v.

Donnie Ray Dovel, Jr.

May 7, 2003

Case No. 27621

BY JUDGE JOHN J. MCGRATH, JR.

This case involves the continuing and vexing question of the legality of automobile "check-points," "road blocks," and "blockades." Although there may be occasions where there are subtle distinctions between check-points, road blocks, and blockades, in this case they will all be referred to as a "check-point."

It has been well established at the federal and state level that check-points can be used for enforcing road safety laws (drunk drivers, license status of drivers, etc.) and for policing illegal immigration or smuggling at or in proximity to our nation's borders. See, *e.g., Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990); *United States v. Ramsey,* 431 U.S. 606 (1977), *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976).

Check-points used for road safety purposes pass constitutional muster so long as they are conducted in accordance to a pre-recorded plan which sets forth neutral criteria covering virtually all aspects of the establishment and execution of the check-point. See, *e.g., Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990); *Lowe v. Commonwealth,* 230 Va. 346 (1985); *Palmer v. Commonwealth,* 36 Va. App. 169 (2001). After the Supreme Court's recent decision in *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000), it is clear that check-points may not be set up with the primary purpose of interdicting illegal drugs.

## I. *Facts*

In this case, the Harrisonburg Police Department (HPD) set up a traffic check-point on Vine Street in the City of Harrisonburg from 10:00 P.M. on November 30 until 2:00 A.M. on December 1, 2002. This check-point was to be funded pursuant to a state grant under the auspices of "Operation Strike Force" and "Operation Buckle Up." A substantial portion of the cost of the check-point was reimbursed by the Alcoholic Beverage Control Commission of Virginia. Sgt. Cull-Wright, the supervising officer whose memo authorized the check-point, provided, *inter alia*:

> The checkpoint will be conducted in accordance with General Order 5-9, sec. III. All vehicles that pass through the checking area will be stopped unless traffic congestion becomes too heavy. I would then alter the detail to check a regular pattern of every other vehicle, or every third vehicle as specified by the General Order. . . . The driver of every vehicle passing through the checking detail will be checked for sobriety as well as driver's license status. The driver of any vehicle pulled out of the line of traffic for a suspected violation will have their license status as well as a wanted check performed on them.

(Ex. 1.)

There is no claim in this case that the purpose of the check-point was "pretextual."

The check-point in this case was conducted in accordance with General Order 5-9, Sec. III, of the HPD, which provides in pertinent part:

> 1. A system shall be established for stopping and checking vehicles passing through the checkpoint, e.g. *all vehicles*, every third vehicle, every fifth vehicle, etc. All vehicles regardless of what type shall be checked, that fall within the system. The system may be modified upon approval of the supervisor when necessary, due to safety or traffic volume.

Prior to establishing the check-point on November 30, 2002, the HPD posted a notice in the Duty Room for officers who were willing to work over-time to sign up for assignment to the check-point detail. One of the officers who signed up for this checking detail was Officer Wright. Officer Wright happened to be a K-9 officer who lived with and handled Wilco, a police dog

trained in drug detection, tracking, and the pursuit and apprehension of fleeing criminals.

As a general practice and procedure, whenever a K-9 officer, such as Officer Wright, is on duty, he brings his police dog along with him. Thus, on the night of November 30, 2002, Wilco accompanied Officer Wright to the check-point location. While Officer Wright worked the checking detail along with the other officers, Wilco stayed in Officer Wright's police cruiser. However, from time to time, other officers would ask Officer Wright to bring Wilco out of the cruiser and take a sniff-around a particular vehicle or person.

On the evening in question, Officer Ray, one of the police officers working the detail, was checking the defendant's license status when he became suspicious of an odor of marijuana emanating from his vehicle. Officer Ray asked Officer Wright to bring Wilco over to defendant's car where Wilco immediately "alerted" on the console area of defendant's car and where marijuana was located and seized.

## II. *Legal Analysis*

The defendant attacks the search of the car and seizure of the marijuana on two separate grounds: (1) the check-point was invalid because the executing officers had too much discretion to alter the plan because of the lack of a definition of "congestion" in the General Order and in Sgt. Cull-Wright's memo; and (2) the undefined use of a drug dog at the scene gave impermissible discretion to the officers executing the check-point.

### A. *Failure to Define "Congestion"*

From dicta in the Supreme Court's ruling in *Delaware v. Prouse*, 440 U.S. 648 (1979), a large body of federal and state jurisprudence has arisen which permits road safety related check-points so long as they do not "involve the unconstrained exercise of discretion" by the officers carrying out the check-point. *Id.* at p. 663. See, *e.g.*, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990); *Lowe v. Commonwealth*, 230 Va. 346 (1985). In the Commonwealth of Virginia, the appellate courts and lower courts have upheld check-points conducted under the Virginia State Police Check-Point Plan or similar plans drafted by local law enforcement agencies. In *Palmer v. Commonwealth*, 36 Va. App. 169 (2001), the Court of Appeals summarized the state of the law as follows:

"The validity of a checkpoint depends upon the amount of discretion remaining with the field officers operating the roadblock. Clearly, roadblocks are constitutional when conducted according to explicitly neutral plans which completely eliminate the discretion of the operating officers." *Crouch*, 26 Va. App. at 218, 494 S.E.2d at 146. In *Crouch*, we upheld the constitutionality of a checkpoint where it was established in response to an assignment given to a state trooper to conduct a traffic checking detail at a specific location in Fauquier County some time during the work week. The trooper selected the day and time, and the trooper received "verbal permission" to proceed.

*Id*. at 175.

In at least one Virginia appellate case, the Court of Appeals approved a detailed check-point plan, which was based on the Virginia State Police Plan. *Wesley v. Commonwealth*, 37 Va. App. 128 (2001). The plan approved in *Wesley*, *supra*, provided that:

All vehicles will be screened unless a back-up of (1) more than 20 vehicles occurs in any lane of travel or (2) vehicles back-up more than 400 feet from the designated checking point. The first alternate method will be to check every 2nd vehicle. The second alternate method will be to check every 4th vehicle. If back-ups continue, the operation will be ceased. The method used will be noted on Form SP-99.

*Id*. at p. 130.

Many other "site plans" for "check-points" throughout the Commonwealth contain identical or similar language defining "congestion" and the modifications to be made to check-point procedures when "congestion" is encountered.

This Court can find no Virginia appellate court decision, which holds that a detailed definition of congestion is required for a "check-point" to pass Constitutional muster. The reasoning the courts use in approving check-points does not lead to the conclusion that a precise definition of *each* term in a plan is a *sine qua non* for a valid plan. See, *e.g.*, *United States v. Ortiz*, 422 U.S. 891 (1975); *Palmer v. Commonwealth*, 36 Va. App. 169 (2001); *Crouch v. Commonwealth*, 26 Va. App. 214 (1997). *See also, Commonwealth v. Condella*, 13 Pa. D.C. 4th 507 (1992); *State v. Eggleston*, 671 N.E.2d 1325 (Ohio App. 1996); *State v. Bates*, 902 P.2d 1060 (New Mexico 1995).

"Congestion" is an inherently subjective condition, which is much like "poor weather," "poor visibility," and "safety" and which may be best determined by a Supervising Officer who is at the site of the check-point. It must also be noted, that once "congestion" is determined by the Supervising Officer, the HPD plan contains an explicit and non-discretionary manner to deal with the congestion. The type of discretion allowed by the HPD Check Point Plan is confined and limited, and it is the type of judgment that can be made on a case-by-case basis by a responsible Supervising Officer on the scene. Although a twenty car backup, as allowed by many plans, may be tolerable on a rural two-lane or four-lane road, it may be completely unacceptable in an urban environment such as exists in the City of Harrisonburg. As the Court of Appeals recently held in *Palmer v. Commonwealth*, 36 Va. App. 169 (2001):

> The United States Supreme Court has stated that the judiciary's review role in Fourth Amendment cases involving checkpoints was "not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. . . . For purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and responsibility for, limited public resources, including a finite number of police officers." . . . Absent strong evidence of abuse or other similar good cause, which is absent in this record, we will not venture into law enforcement choices which properly reside with the law enforcement officers and their politically accountable superiors in the executive branch of government.
>
> The constitutionality of a checkpoint hinges on the evaluation of the field officer's discretion in establishing the checkpoint and whether or not the execution of the checkpoint "involves standardless, unbridled discretion by the police officer in the field." *Lowe*, 230 Va. at 352, 337 S.E.2d at 277. If the field officers' discretion is limited and the field officers employ neutral criteria in stopping vehicles, the checkpoint is constitutionally permissible, and we so hold in this case.

*Id.* at 177-78 (citations omitted).

For the foregoing reasons, Defendant's challenge to the seizure of the marijuana in his car on the grounds that a lack of a definition of "congestion" in the HPD plan violated the Fourth Amendment of the Constitution is denied.

## B. *Use of Drug Dog at a Sobriety Check Point*

The second challenge is to Officer Wright's use of Wilco, his drug-trained canine, at the sobriety check-point. The Court has not been able to locate any Virginia or non-Virginia precedent on this point. However, general principles of constitutional interpretation of searches and seizures are helpful in solving this issue of first impression. First, the jurisprudence surrounding check-points and road blocks (excluding border situations) is to prevent police authorities from exercising biased, malevolent, or arbitrary techniques in conducting searches and seizures. See, *e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Palmer v. Commonwealth*, 36 Va. App. 169 (2001).

It must be emphasized that this case *does not* involve the use of a drug dog at a sobriety check-point which is merely a pretextual ruse to interdict drugs; this case *does not* involve the use of a drug dog at a sobriety check-point pursuant to a provision in a sobriety check-point plan which sets out the metes and bounds of the use of a drug dog pursuant to neutral criteria.

The *raison d'etre* of check-point jurisprudence is that the protection of requiring particularized probable cause or reasonable articulable and individualized suspicion of criminal wrongdoing is supplanted by a rigorous objective program of seizure that virtually eliminates the police officers' authority on who to stop. Thus, the police operating a check-point cannot be given such discretion so that they can, for example, stop, seize, and search only cars that have Rebel Flag bumper stickers on the car, or only those with black or hispanic drivers, or only those with white male drivers with long hair, etc. .

In this case, the evidence was that the drug dog was used whenever one of the officers working the check-point had something he wanted the dog to look (smell) into. Here Officer Guy thought he smelled marijuana and asked for Wilco to be brought over. Wilco then located the drugs in the console area of the defendant's car.

Because there was no protocol for the use of the dog, the officers at the scene were able to exercise "unbridled discretion" as to which citizens would be subject to a drug dog "search" or "sniff." This is just the type of discretion which renders the implementation of check-points so constitutionally delicate and suspect. In this case, the discretion to use or not use and how to use the drug dog was too great to pass constitutional muster.

There may well be ways that drug dogs can be used at sobriety check-points. If there are, they will have to be under more detailed procedures as to when, where, why, and how the dogs will be used.

Therefore, the Defendant's Motion to Suppress the evidence seized from his vehicle because of the use of Wilco is granted.

The Clerk of the Court is directed to send attested copies of this Opinion and Order to W. Andrew Harding, Esquire, Assistant Commonwealth's Attorney, and to A. Gene Hart, Esquire, counsel for the defendant.