IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. TERRY R. McCULLOCH

**Direct Appeal from the Criminal Court for Loudon County**
**No. 10305     E. Eugene Eblen, Judge**

---

**No. E2003-01901-CCA-R3-CD**
**May 18, 2004**

---

The defendant, Terry R. McCulloch, pled guilty to DUI, third offense, and driving on a revoked license, reserving as a certified question of law whether the trial court erred in denying his motion to suppress evidence obtained as a result of a driver's license roadblock stop. On appeal, he argues that the roadblock stop was unconstitutional. Following our review, we reverse the judgment of the trial court and dismiss the charges against the defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Kent L. Booher, Lenoir City, Tennessee, for the appellant, Terry R. McCulloch.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; J. Scott McCluen, District Attorney General; and Frank A. Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for driving on a revoked license, DUI, and DUI, third offense. He subsequently filed a motion to suppress the evidence seized as a result of his roadblock stop, alleging that the stop "was without a warrant, without probable cause or reasonable suspicion, and therefore in violation of the United States and Tennessee [C]onstitutions." After a hearing on May 30, 2003, the trial court denied the motion, finding that the roadblock stop of the defendant complied with the requirements of State v. Downey, 945 S.W.2d 102 (Tenn. 1997). The defendant then pled guilty on July 10, 2003, to DUI, third offense, and driving on a revoked license and was sentenced, respectively, to eleven months, twenty-nine days, with 125 days to be served in confinement and

eleven months, twenty-nine days in community corrections, and six months community corrections.[1] In addition, he was fined $1200 and his driver's license was suspended for three years. Pursuant to the plea agreement, the defendant properly reserved the following certified question of law:

> Whether the trial judge erred by failing to suppress evidence gathered pursuant to a driver's license roadblock stop of the defendant conducted by the Tennessee Highway Patrol and Lenoir City Police Department in the absence of probable cause, reasonable suspicion or compliance with the requirements of State v. Downey?

## Suppression Hearing

Trooper Jack C. Watson of the Tennessee Highway Patrol testified that on March 15, 2000, he participated in a driver's license checkpoint at the intersection of McGhee Boulevard and Kelly Lane in Lenoir City. The Lenoir City Chief of Police had asked Watson's supervisor, Lieutenant Larry Parsley, for assistance with the checkpoint as a result of numerous complaints of motorists driving without a driver's license and with expired tags. After Lieutenant Parsley had set up the checkpoint at approximately 6:30 p.m., Watson, along with three or four other troopers and several city police officers, stopped "[a]ll of the cars [they] could" in both directions, asking drivers for their licenses. He said the patrol cars, with their blue lights activated, were positioned in a manner where they could be seen "easily and readily" from either direction. According to Watson, the established procedure for checkpoints at that time was "to have at least two marked vehicles with lights on, prior approval of a supervisor to do a driver's license checkpoint. And that's all." Watson said that Lieutenant Parsley remained on the scene, and they conducted the checkpoint for "probably an hour or longer." There were no blood alcohol testing machines on the scene. When Watson asked the defendant for his driver's license, the defendant was unable to produce a valid license.

On cross-examination, Watson acknowledged that there were no warning signs to advise motorists of the roadblock and said he did not know of any publications or advertisements advising of the roadblock. He said that the highway patrol officers wore reflective vests and used spotlights in addition to their flashing blue lights and headlights. Watson could not remember if a drug dog was present.

The defendant testified that when he approached the checkpoint around 8:00 p.m., he saw "a lot of bluelights," "traffic backed up everywhere," and a "drug dog . . . going through cars." He said that Officer Joe Foster, whom he had known for twenty to twenty-five years, was present with a drug dog and that cars were stopped in both directions. As to the officers conducting the checkpoint, the defendant said that none wore a reflective vest or used a lighted baton to help direct traffic. He also said that no traffic cones or orange barrels were used at the checkpoint.

---

[1]Although the guilty plea form executed by the defendant recites that he is to receive a sentence of 125 <u>days</u> in confinement, the judgment provides that he is to be confined for 125 <u>hours</u>.

On cross-examination, the defendant denied that he had been drinking at the time but admitted that his blood alcohol level was .09%. Asked if his blood alcohol level had impaired his judgment to drive, the defendant replied, "No, sir, not a .09. You know, it's not – you're not really impaired." The defendant acknowledged that when the officer first approached him, the officer only asked for his driver's license and did not ask him to get out of his vehicle until after the officer discovered that he did not have a license.

At the conclusion of the hearing, the trial court denied the motion, stating: "From the totality of the circumstances the Court finds a substantial compliance with the requirements [of State v. Downey, 945 S.W.2d 102 (Tenn. 1997)]. The Court will overrule your motion to suppress."

## ANALYSIS

The defendant argues that the roadblock stop was unconstitutional and, alternatively, that the trial court erred in finding that the stop complied with the requirements of Downey.

### Standard of Review

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light of the entire record[,]" an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

## Constitutionality of Roadblock

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. at 865 (citations omitted). The stop of an automobile, even for the short duration involved in a driver's checkpoint, constitutes a seizure under both the United States and Tennessee Constitutions. See Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996); Michigan v. Sitz, 496 U.S. 444, 449-51, 110 S. Ct. 2481, 2485, 110 L. Ed. 2d 412 (1990); Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660 (1979); Downey, 945 S.W.2d at 107. Thus, to be considered reasonable, the warrantless stop of an automobile must fall under one of the exceptions to the warrant requirement. These exceptions include investigative stops based on reasonable suspicion of wrongdoing on the part of the occupants of the vehicle, see Whren, 517 U.S. at 810, 116 S. Ct. at 1769; Prouse, 440 U.S. at 655, 99 S. Ct. at 1391; State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997), and roadblocks that are conducted "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, 443 U.S. 47, 51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357 (1979). Under the latter exception, the United States Supreme Court, balancing the public interest in preventing drunk driving against the Fourth Amendment interest of the individual, has held that a roadblock designed to check for intoxicated drivers is not violative of the Fourth Amendment to the United States Constitution. Sitz, 496 U.S. at 453, 110 S. Ct. at 2485.

In Downey, 945 S.W.2d at 110, our supreme court adopted the balancing analysis used in Sitz to determine whether sobriety checkpoints violate Article I, section 7 of the Tennessee Constitution. Under this analysis, which weighs "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty,'" id. at 107 (quoting Brown, 443 U.S. at 50-51, 99 S. Ct. at 2640), the court concluded that a sobriety checkpoint, because of the compelling public interest in preventing drunk driving, can be a reasonable seizure under the Tennessee Constitution "provided it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene." Id. at 104. Because the evidence in Downey revealed that the decision to operate the checkpoint was made by an officer in the field, who acted without any supervisory or administrative oversight of his actions, the court found that the roadblock was unconstitutional under Article I, section 7 of the Tennessee Constitution. Id. at 110-11.

More recently, in State v. Hicks, 55 S.W.3d 515 (Tenn. 2001), our supreme court addressed the constitutionality of drivers' license roadblocks under Article I, section 7 of the Tennessee

Constitution. Id. at 519. A plurality of the court[2] explained that the balancing test used in Downey is to be applied not just to sobriety checkpoints, but in "all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution." Id. at 524. It next determined that, under the Downey test, "a roadblock will necessarily fail constitutional examination if it lacks a sufficiently compelling state interest." Id. at 527. The court then considered whether there is a sufficiently compelling state interest to justify roadblocks established solely to check drivers' licenses.

The court explained the showing required of the State:

> Because the exceptions to the warrant requirement "are jealously and carefully drawn," the State must show that "the exigencies of the situation made the search [or seizure] *imperative*." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (emphasis added and internal quotations omitted). Therefore, as required in Downey, the State must show that drivers not possessing a license are unable to safely operate motor vehicles on the roads and highways of this state; that an unlicensed driver invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. Only when this showing is made may courts find that the State has a sufficiently compelling interest to justify maintaining drivers' license roadblocks.

Id.

After examining the State's assertion that drivers' license roadblocks are necessary to ensure highway safety by detecting and deterring unlicensed drivers, the court concluded that "no evidence in the record establishes this fact, or even if true, establishes that this interest is sufficiently compelling to justify suspicionless stops." Id.

The Hicks court explained further that drivers' license roadblocks are subject to the same requirements for constitutional reasonableness as sobriety roadblocks, including limitations on the discretion of officers conducting the roadblock:

> [T]he most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field. Two facts are critical to finding that the officers' discretion on the scene was properly limited: (1) the decision to set up the

_____

[2]Another plurality of the court concluded that, under the Tennessee Constitution, drivers' license roadblocks could not be justified by any circumstances.

roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock. In all cases, therefore, the State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation. To be clear, these factors are so essential to a reasonable roadblock that the absence of either of them will necessarily result in the invalidation of the stops.

Id. at 533 (citation omitted).

The setting up of the driver's license checkpoint which is the basis for this appeal occurred in 2000, approximately a year before the release of the opinion in Hicks, wherein our supreme court explained further the necessity of the State's proving its interest in establishing the roadblock:

The presence of a sufficiently compelling state interest justifying a warrantless seizure at a checkpoint is an important, if not essential, factor going to the overall constitutional reasonableness of any such stop. The need and importance of this factor were acknowledged in Downey, which devoted considerable attention to examining whether the State possessed a sufficiently "compelling" interest in maintaining sobriety checkpoints.

Id. at 525.

Applying the holdings of Downey and Hicks, we now will consider the claims in this matter.

At the hearing on the defendant's motion to suppress, Trooper Watson explained the reason why the driver's license checkpoint was set up: "They'd had numerous complaints in that particular area where we set up. . . . From that area, . . . and what they told us, that they were driving without driver's license, most of them. A lot of them had expired tags on their cars. They wanted us to check those to see if they had expired tags on the car."

We rely upon language from Hicks to explain the insufficiency of these reasons for establishing a checkpoint:

[T]he State may not merely rely upon its general interest in maintaining the integrity of its drivers' licensing scheme to justify future roadblocks. We see no indication from the record that the State's interest in enforcing a drivers' license law is any greater than its interest in enforcing any other law, and indeed, the State's interest

-6-

in enforcing other criminal laws is at least as great as it is in enforcing laws regulating drivers' licenses. If the State may not legitimately establish roadblocks to detect other violations, it follows that the State may not do so merely to enforce drivers' license laws. Therefore, to justify suspicionless stops in this context, the State must necessarily rely upon the need to curb a substantial and imminent threat to the safety of motorists on public roads distinctly resulting from the conduct of unlicensed drivers.

Id. at 530.

While the State presented testimony that complaints had been made of unlicensed drivers in the area where the roadblock was established, no showing was made as to how the presence of such drivers sufficiently endangered the public so as to permit a roadblock. Accordingly, we conclude that the prosecution failed to establish a compelling state interest in this roadblock.

Continuing with its analysis, the court in Hicks examined the extent to which the State showed that the roadblock advanced the "compelling state interest." Id. at 531. The court noted that the evidence in Hicks "did not uncover a single driver who was operating a vehicle without a valid license." Id. Further, the court observed that "complete ineffectiveness of this roadblock in detecting unlicensed drivers was somewhat of an anomaly" and concluded that the absence of proof of "some meaningful link between its establishment and the achievement of its compelling interest . . . weigh[s] heavily against finding that the roadblock here was constitutionally reasonable." Id. at 532-33. In the present case, the State did not show that any driver stopped other than the defendant did not have a valid driver's license, and there was no testimony that any of the vehicles stopped had expired tags. This fact weighs against our finding that this roadblock was "constitutionally reasonable."

As for the intrusiveness of the roadblock, the court in Hicks instructed that we should determine the extent to which it arbitrarily intruded on motorists, including whether traffic was stopped in both directions; whether safety precautions, such as flashing lights were utilized; whether the roadblock consisted of uniformed officers and vehicles with flashing lights; and whether advance publicity was given of the roadblock. Id. at 533. However, the most important consideration in ascertaining whether the roadblock was reasonable "is the presence of genuine limitations upon the discretion of the officers in the field." Id.

Applying all of these considerations, the court in Hicks explained that the roadblock violated minimum constitutional standards:

First, the level of intrusion into the liberty and privacy of the citizens stopped was beyond that characterized as reasonable by Downey. Second, the State offered no evidence to show prior administrative approval, and because the State has the burden of establishing the

reasonableness of the roadblock, we will not presume that such was the case. Third, the record demonstrates that the officers on the scene decided for themselves the proper procedures to be followed and that these officers were not adequately supervised. Finally, the record contains much evidence to show that the drivers' license roadblock was initially established and operated in the field as a method to pursue objectives other than to detect and deter unlicensed drivers. Accordingly, we hold that this roadblock represented an unreasonable interference with the liberty and privacy of the citizens stopped in violation of Article I, section 7 of the Tennessee Constitution.

Id. at 538.

Applying these considerations to the present appeal, we note that, according to Trooper Watson, the roadblock had been set up by his supervisor, Lieutenant Parsley, and marked law enforcement vehicles, with their blue lights flashing, were positioned so that they could be seen from a distance in either direction, and cars were stopped from both directions. Watson was not aware of the roadblock having been publicized in advance.

The testimony at the hearing was not sufficiently detailed for us to apply easily the considerations set out in Hicks and ascertain the intrusiveness of the roadblock. First, while Trooper Watson testified that there were procedures to be followed at the roadblock to check drivers' licenses, he said that these consisted of having "at least two marked vehicles with lights on, prior approval of a supervisor to do a driver's license checkpoint. And that's all." He said that he was "using" the appropriate general order to conduct the roadblock, but he could not recall its number. He testified that his supervisor, Lieutenant Parsley, had authorized the roadblock and, apparently, had instructed at the scene as to the procedures to be followed. They did not stop vehicles randomly, but "checked all" they could. Their supervisor determined where the cars were parked, ordered that their blue lights be in operation, and tried to separate the officers so that the same number of officers was dealing with vehicles from each direction. The roadblock was in place "probably an hour or longer" and had begun around 6:30 p.m. He said there were no machines at the scene to test blood alcohol readings. The highway patrol officers wore their reflective vests and utilized their spotlights and headlights, in addition to their flashing blue lights.

Department of Safety General Administrative Order 410, the provisions of which were considered by our supreme court in both Downey and Hicks, was not made an exhibit in this matter, or referred to other than fleetingly during the hearing. However, considering the provisions of Order 410 detailed by the court in Hicks, it is apparent that the State did not show that the order was followed either in establishing or conducting the checkpoint. The roadblock considered in Downey was operated by a lieutenant, but no showing was made that he had obtained prior administrative approval for his action. Likewise, in the present appeal, there is no proof as to whether Lieutenant Parsley followed procedures in establishing the roadblock or in the manner in which it was

-8-

conducted.  The court explained in <u>Hicks</u> that "<u>Downey</u> clearly condemns the same person holding the power to approve and establish a roadblock."  <u>Id.</u> at 534.

Considering all of this together, we conclude that the defendant is correct in his argument that the roadblock violated his constitutional rights.  First, the State did not offer any proof of a compelling state interest in establishing a roadblock solely to detect those without valid drivers' licenses or with expired tags.  Secondly, the State did not show that Order 410 administrative procedures were followed in establishing and operating this roadblock.  Trooper Watson's knowledge in this regard was very limited, and, without this information, we simply cannot conclude that the roadblock was conducted in accord with Order 410.  We conclude that the trial court erred in ruling that the stop of the defendant's vehicle, resulting in his arrest, was lawful.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, we reverse the judgment of the trial court and dismiss the charges against the defendant.

_____
ALAN E. GLENN, JUDGE