ROBERTS, J.,
for the Court:
¶ 1. Michael Rogowski was stopped at a driver’s license checkpoint operated by the Lamar County Sheriffs Department. He refused to present his driver’s license, and ultimately he was arrested for disorderly conduct. He was convicted in the Justice Court of Lamar County of that charge. He appealed to the County Court of Lamar County, where after a trial de novo, the county court judge found him guilty of disorderly conduct, and imposed a fine of five hundred dollars. Rogowski appealed to the Circuit Court of Lamar County, which sitting as an appellate court, affirmed the conviction. Rogowski appealed the conviction to the Mississippi Supreme Court, and the appeal was assigned to this Court. Upon appeal, Rogowski, pro se, does not contend there was insufficient evidence to find him guilty of disorderly conduct. Rather, Rogowski contends only that the checkpoint was an illegal seizure that violated his rights secured by the Fourteenth Amendment to the United States Constitution. Finding no error, we affirm.
FACTS
¶ 2. Lamar County Sheriffs Deputy Joshua Craft testified in the county court that, on the night of November 11, 2011, he and five or six other deputies operated a driver’s license checkpoint. It was dark, but the deputies were in uniform, wearing reflective vests, and police cruisers were parked at the checkpoint with their blue lights flashing. Deputy Craft testified Ro-gowski pulled up to the checkpoint. Depu *1235 ty Craft asked to see Rogowski’s driver’s license, and Rogowski refused to show it. Deputy Craft opened Rogowski’s vehicle door and unbuckled his seat belt. ■ Rogow-ski “locked out his arms and legs,” and refused to get out of the vehicle. Deputy Craft testified Rogowski was then forcibly removed from the vehicle, and they “struggled for a few moments.” Rogowski was then handcuffed and arrested for disorderly conduct.
¶ 3. The only other witness testifying in the county court was Rogowski, who also represented himself in that court. His version of events was quite different. He testified he was driving home from a class project at the University of Mississippi and observed something in the unlit road, which at first he took to be an animal of some kind, but upon getting closer, Ro-gowski realized he was looking at “a human figure in dark clothing standing in the middle of the road in the left turn [Rogow-ski’s] vehicle was in.” Rogowski testified the intersection was not well lit, but the individual turned on a flashlight and waived it at him, so he slowed to a stop by the person, and partially rolled down his window. Rogowski said the individual shined the flashlight directly into his eyes and “blinded” him. At some point in time, Rogowski noticed there was more than one individual. He further noticed that at least one individual wore a “small yellow vest,” but the vest was not at all reflective. Rogowski stated the individual at his vehicle’s window “became angry” and asked for his identification, and before he could ask who the people were or what they were doing, they reached inside his vehicle and tried to remove him from it, so he locked his arms on the steering wheel. He stated he was attempting to engage his vehicle’s clutch and put the transmission in neutral to avoid harming anyone. Only then did he notice the individuals were “police officers.” He was then removed from the vehicle, handcuffed, arrested, and transported to the sheriffs office.
ANALYSIS
¶ 4. The standard of review for determining whether the evidence is legally sufficient to sustain a conviction in a case tried without a jury is the same as the standard for reviewing a denial of a motion for a judgment notwithstanding the verdict. This Court may only reverse where the evidence supporting one or more of the elements of the offense charged is so lacking that the fact-finder could only have found the defendant not guilty. Robinson v. State, 794 So.2d 293, 296 (¶ 12) (Miss.Ct.App.2001). Further, the testimony of one witness is sufficient to sustain a verdict, even when the testimony is contradicted, and it is the duty of the fact-finder to determine the credibility of witnesses. Lewis v. State, 110 So.3d 814, 818 (¶ 7) (Miss.Ct.App.2013).
¶ 5. It is well settled that routine traffic stops are justifiable because they are only minimally intrusive, and the checkpoints themselves are “very effective” in determining whether drivers are properly licensed. Dale v. State, 785 So.2d 1102, 1106 (¶ 11) (Miss.Ct.App.2001); see also McLendon v. State, 945 So.2d 372, 380-81 (¶¶ 17-21) (Miss.2006). Driver’s licensing and highway safety are interests justifying routine traffic checks. City of Indianapolis v. Edmond, 531 U.S. 32, 39-40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).
¶ 6. Rogowski contends the evidence in this case was insufficient to find the seizure involved in stopping him at the checkpoint satisfied the balancing test of Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). A stop of any kind is a seizure, but such a seizure will be allowed if it was reasonable. Dale, 785 So.2d at 1106 (¶ 11). In determining *1236 whether a roadblock is a reasonable seizure, the inconvenience of a typical motorist is balanced against the State’s interest in performing the roadblock. Brown, 443 U.S. at 50, 99 S.Ct. 2637. “Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.” Id. at 50-51, 99 S.Ct. 2637.
I. WHETHER THE CHECKPOINT SERVED A PUBLIC CONCERN
II. WHETHER THE CHECKPOINT ADVANCED THE PUBLIC INTEREST
¶ 7. Rogowski contends “the gravity of the public concern about ‘driver’s license safety,’ if any even exists, does not outweigh the severity of the interference with individual liberty created by this checkpoint.” Rogowski urges that we find the State must demonstrate that an individual traffic stop has some statistical degree of effectiveness in detecting unlicensed drivers to prove it served a public concern. Similarly, Rogowski contends the State must show this particular traffic stop met some statistical measurement of effectiveness in serving the public interest. Rogowski contends it was arbitrary to conduct the checkpoint “in a remote residential area late at night” because few drivers are stopped. To support his assertion that a degree of statistical success need be shown, Rogowski cites to Michigan Department of State Police v. Sitz, 496 U.S. 444, 454-455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
¶ 8. However, Sitz in no way supports Rogowski’s argument. Rather, the Sitz Court explicitly stated the effectiveness of a traffic stop is not an invitation for courts to inquire into the effectiveness of how “politically accountable” law enforcement agencies allocate their resources. Id. at 445, 110 S.Ct. 2481. Further, the Sitz Court expressly stated the inquiry into effectiveness does not support a “searching examination” of effectiveness. Id. at 453-54, 110 S.Ct. 2481. As this Court discussed in Dale, the “effectiveness” of a particular checkpoint is rarely stated as any degree of how many arrests were made, but rather since every driver passing through is checked for a valid driver’s license, checkpoints themselves are “very effective” in serving the governmental interest of road safety. Dale, 785 So.2d at 1106 (¶ 11).
¶ 9. Rather than determining whether a traffic checkpoint is legally justified by a degree of statistical usefulness, the United States Supreme Court has restrained itself to inquire only as to either the purpose of the stop or the nature of the liberty deprivation. Uniform traffic stops are generally viewed favorably when the purposes are to enhance road safety, protect the public from unlicensed drivers, identify unregistered vehicles, and locate intoxicated drivers. Edmond, 531 U.S. at 46-48,121 S.Ct. 447. However, when traffic stops are used to look for evidence of “ordinary criminal wrongdoing,” such as possession of illegal drugs, then there is a lack of probable cause to support the seizure that results in an illegal seizure. Id. at 41-42, 121 S.Ct. 447. Further, it is not permissible for law enforcement to randomly stop some, but not all, vehicles at a checkpoint, when there is no discernable reason to detain any of the vehicles. Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
¶ 10. Deputy Craft testified that he and the other deputies were conducting a routine traffic-safety checkpoint, and vehicles were routinely and regularly stopped. *1237 Nothing in the record suggests Deputy Craft and the other deputies were seeking to find evidence of crimes unrelated to traffic safety. Nothing in the record even suggests that Rogowski was subjected to a random stop, in which only some individual motorists were stopped. Thus, Deputy Craft’s testimony established the checkpoint was set up to serve the permissible interest of highway safety. Nothing in the record supports a finding that Rogowski was subjected to any more, or any less, deprivation of liberty than all other motorists passing through the driver’s license checkpoint. Therefore, we find that the checkpoint at issue in this case served a public concern and advanced a public interest, and Rogowski’s liberty interests were not so infringed as to make Rogow-ski’s stop at the driver’s license checkpoint an illegal seizure.
III. WHETHER THE CHECKPOINT PRESENTED A SEVERE INTRUSION ON INDIVIDUAL LIBERTY
¶ 11. Rogowski contends the specific “intensity of the questioning” and “abuse of discretion” by sheriffs department personnel transformed what is typically a minimal intrusion on liberty in a traffic-checkpoint stop into a severe intrusion. Rogowski contends this severe intrusion made the seizure illegal, and therefore requires that we reverse his conviction of disorderly conduct. Deputy Craft’s testimony was that the stop of Rogowski’s vehicle was no different from other stops, and Rogowski’s actions, when he refused to present his driver’s license and then struggled against being removed from the vehicle, disrupted the operation of the checkpoint. Rogowski’s testimony was quite to the contrary, and he contended he was unfairly surprised and then arrested despite behaving in a reasonable manner. Nevertheless, witness credibility is for the finder of fact, and will not be disturbed on appellate review without some showing of manifest error. Reed v. State, 749 So.2d 179, 181 (¶ 3) (Miss.Ct.App.1999). The county court judge found Deputy Craft to be more credible, and this Court will not overturn that finding based on the record.
¶ 12. Additionally, Rogowski contends there were no established procedures or guidelines for the operation of the checkpoint. This Court previously declined to hold sheriffs department officials are required to have “set departmental procedures” for operating traffic-stop checkpoints. Dale, 785 So.2d at 1106 (¶ 13). We do not see any reason to depart from this holding.
¶ 13. In sum, we do not find the record shows Rogowski was subjected to any more intrusion into his liberty interests by the stop/seizure than the intrusion suffered by all other drivers passing through the driver’s license checkpoint. Of course, his arrest deprived him of more liberty interest than the deprivation suffered by those drivers who were not arrested. However, we cannot say the county court judge erred in finding the reason for the arrest was Rogowski’s disorderly conduct.
¶ 14. THE JUDGMENT OF THE CIRCUIT COURT OF LAMAR COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.