# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| | ) |
| v. | ) |
| | ) **I.D. No. 1310001662** |
| | ) |
| BOB  MUGO | ) |


On Defendant's Motion to Suppress Evidence

**DENIED**


## OPINION AND ORDER

Submitted: September 5, 2014
Decided: September 23, 2014


Michael B. DegliObizzi, Esquire, Deputy Attorney General, 820 North French Street, 7th Floor, Wilmington, DE 19801; Attorney for State of Delaware.


Joseph A. Hurley, Esquire, 1215 King Street, Wilmington, DE 19899; Attorney for Defendant.


**WHARTON, J.**

# I. INTRODUCTION

Defendant Bob Mugo was arrested and subsequently indicted on the charge of Driving a Vehicle While Under the Influence of Alcohol or With a Prohibited Alcohol Content. He filed a Motion to Suppress Evidence on June 24, 2014.[1] The State submitted its Response on July 3rd.[2] A suppression hearing was held on August 22nd. Following the hearing, the Court requested that the parties submit simultaneous memoranda on an issue regarding a discrepancy between certain language in the Delaware State Police's (DSP) sobriety checkpoint guidelines and those of the Office of Highway Safety (OHS). The parties have submitted those memoranda. The Court did not request memoranda on other issues raised by the motion.

Upon consideration of the Motion to Suppress Evidence, the State's Response, the evidence presented at the suppression hearing, the arguments of counsel and the parties' post-hearing submissions, the Court finds that the language of the DSP checkpoint guidelines, taken as a whole, requires reasonable, articulable suspicion of driving under the influence before a police officer may detain a driver for purposes of conducting a further investigation. The Court also finds that the Defendant's other complaints about the execution of the guidelines

---

[1] D.I. #13.
[2] D.I. #14.

are without merit. Accordingly, the Defendant's Motion to Suppress Evidence is **DENIED.**

## II. FACTS

The basic facts are not in material dispute. DSP Lt. Michael Wysock testified that he requested and received approval to conduct a sobriety checkpoint at Salem Church Road at Adel Drive in New Castle County on September 20, 2013. The location was selected because it met certain criteria regarding alcohol related crashes and alcohol related arrests during the previous three years. The checkpoint was approved for the hours of 10:00 p.m. to 2:00 a.m. Lt. Wysock's testimony touched on each of the guidelines set out for requesting and conducting the checkpoints. The State introduced, through Lt. Wysock, a copy of the sobriety checkpoint guidelines,[3] the 2013 DUI Checkpoint Grid,[4] Lt. Wysock's memo requesting approval for the September 20th checkpoint containing Capt. Benson's approval[5] and a statistical report of the results of the checkpoint.[6]

DSP Lt. Roger Davis was the officer who made contact with the Defendant as one of the officers working the line of vehicles stopped at the checkpoint on September 20th. Lt. Davis testified the he detected a strong odor of alcohol coming from the Defendant's person and breath to the point where the Defendant

---

[3] State's Ex. 1. Exhibits refer to exhibits admitted into evidence at the suppression hearing.
[4] State's Ex. 2. The grid listed possible DUI checkpoint locations for 2013 based on alcohol related crash and arrest statistics for the previous three years.
[5] State's Ex. 3.
[6] State's Ex. 4.

reeked of alcohol. Lt. Davis also testified that the Defendant's eyes were bloodshot and appeared glassy and that the Defendant's speech was slurred. At that point Lt. Davis asked the Defendant to pull into a parking lot for further investigation.

### III. THE PARTIES' CONTENTIONS

The Defendant raises several issues in support of his motion. First, he argues that there is a fatal discrepancy between the DSP checkpoint guidelines and the OHS guidelines used for checkpoints conducted by Delaware municipal police officers.[7] Specifically, the Defendant asserts that the DSP guidelines require only "articulable suspicion"[8] before an officer may undertake further investigation, while the OHS guidelines require "reasonable, articulable suspicion."[9] The difference is important, he argues, because "reasonable, articulable suspicion" and "articulable suspicion" are not the same thing and every stop must be based on reasonable, articulable suspicion under the Fourth Amendment, not merely articulable suspicion.[10] The Defendant also argues that the September 20th checkpoint failed to comply with the DSP guidelines because Lt. Wysock did not

---

[7] Def's. Ex. 1.
[8] State's Ex. 1 at ¶7.
[9] Def's. Ex. 1 at ¶6.
[10] D.I. #24.

request approval for the checkpoint at least one week in advance and because there was insufficient proof of advance publicity of the checkpoint.[11]

The State, citing *United States v. Henson*,[12] argues that there are essentially three factors for the Court to consider in determining whether a checkpoint complies with the Fourth Amendment: (1) the checkpoint must be clearly visible; (2) it must be part of a systematic procedure that strictly limits the discretion of police officers; and (3) drivers are detained no longer than reasonable to accomplish the purpose of checking license and registration, unless other facts establish a reasonable suspicion of criminal activity.[13] The State also argues that the testimony of Lt. Wysock together with the request for authorization to conduct the checkpoint supports the conclusion that the request was timely. Additionally, the State contends that the testimony of Lt. Wysock establishes that the checkpoint was publicized in advance.

## IV. DISCUSSION

On a motion to suppress, the burden is on the State to prove, by a preponderance of the evidence, that a warrantless search of a vehicle did not violate the Defendant's constitutional rights.[14] It is by now beyond dispute that sobriety checkpoints are not, in and of themselves, violative of the Fourth

---

[11] The Defendant has abandoned equal protection/due process arguments raised at the suppression hearing based on differences between the DSP and OHS checkpoint guidelines.

[12] *United States v. Henson,* 351 F. App'x 818 (4th Cir. 2009).

[13] *Id.* at 821; D.I. #23.

[14] *Hunter v. State*, 783 A.2d 558, 561 (Del. 2001).

Amendment's protections against unreasonable searches and seizures.[15]   In upholding the constitutionality of such checkpoint programs, the Supreme Court held, "…the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped weighs in favor of the state program."[16]   Checkpoint programs are not without their limitations, however.   Frequently cited is the Fourth Circuit's formulation of factors to be considered in determining the reasonableness and, hence, the constitutionality of a checkpoint stop, found in *United States v. Henson:*

> Factors to weigh intrusiveness include whether the checkpoint:
> (1) is clearly visible; (2) is part of some systematic procedure
> that strictly limits the discretionary authority of police officers;
> and (3) detains drivers no longer than is necessary to accomplish
> the purpose of checking a license and registration, unless other
> other facts come to light creating a reasonable suspicion of
> criminal activity.[17]

A substantial amount of suppression litigation seems to have focused on how checkpoints were established and whether there was compliance with the checkpoint guidelines.[18]  In determining the relationship between checkpoint

---

[15]*Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 447 (1990).

[16] *Id.* at 455.

[17] *Henson,* 351 F. App'x at 821.

[18] *See, eg., Bradley v. State,* 2004 WL 1964980 at *1 (Del. Aug. 19, 2004); *State v. McDermott,* 1999 WL 1847364, at *3-4 (Del. Com. Pl. Apr. 30, 1999); *State v. Connell,* 2013 WL 6634000 at *3 (Del. Com. Pl. 2013); *State v. Terry,* 2013 WL 3833085, at *3-6 (Del. Super. Jul. 18, 2013); *State v. Cook,* 2013 WL 1092130 at *5-6 (Del. Super. Feb. 13, 2013).

guidelines and the Fourth Amendment, the court finds *State v. Cook*[19] helpful. Simply put, a list of procedures adopted by either DSP or OHS is not synonymous with the Fourth Amendment. The determination of rights protected by the Fourth Amendment cannot be outsourced to the multitude of state law enforcement and regulatory agencies across the country because the Fourth Amendment must be applied uniformly.[20] Rather, the existence of a set of systemic procedures is but one component, albeit a necessary one, to ensure Fourth Amendment compliance.[21] It follows then, that the degree of compliance with the procedures must be sufficient so as not to make the search unreasonable under the Fourth Amendment.[22]

## A. The Reasonable, Articulable Suspicion Standard Was Not Violated.

Defendant points out that Paragraph 7 of the DSP sobriety checkpoint guidelines reads, "… if the driver's appearance or actions arouse articulable suspicion, they should be detained for further investigation."[23] In contrast, Paragraph 6 of OHS's sobriety checkpoint guidelines reads, "…if the driver's appearance or actions arouse reasonable, articulable suspicion, they may be detained for further investigation."[24] It is the absence of the word "reasonable"

---

[19] 2013 WL 1092130 (Del. Super. Feb. 13, 2013).
[20] *Id.* at *5.
[21] *Id.*
[22] *Id.* at *6.
[23] State's Ex. 1.
[24] Def's. Ex. 1.

before the word "articulable" in the DSP checkpoint guidelines which causes the DSP guidelines to contravene the Fourth Amendment in the Defendant's view. In support of that position, the Defendant has provided citations to dozens of cases where the words have appeared together.[25]

The Court agrees with the Defendant that "reasonable" and "articulable" speak to different concepts and that any suspicion warranting further detention of a suspect must be reasonable as well as articulable. The Court further agrees with the Defendant that the reasonableness of a detention is not subsumed in the officer's ability to articulate a reason for that detention.[26] The Defendant's argument fails, however, when the entirety of DSP's Paragraph 7 is examined:

> 7. This introduction should give the officer ample time to observe the driver and detect the odor of alcoholic beverages emanating from the vehicle. If the driver does not display visible signs of driving under the influence of alcohol or drugs, the driver shall immediately be released. However, if the driver's appearance or actions arouse articulable suspicion, they should be detained for further investigation. At this time, it will be permissible to ask the driver for his license, registration, and insurance card. If the driver still appears under the influence, the officer may ask the driver to exit the vehicle and perform the normal field coordination tests. These tests should be conducted in an area separated from the roadblock itself. Thereafter, standard operating procedures for DUI enforcement shall be followed.[27]

---

[25] D.I. #24 at 2-4.

[26] For example, a decision to detain a defendant determined by a Ouija board may be articulable, but it is not reasonable.

[27] State's Ex. 1.

The first point to note is that, while the officer is introducing himself to the driver, he is to be observing the driver and detecting if the odor of an alcoholic beverage is emanating from the vehicle.[28] If the driver does **not** display visible signs of driving under the influence, the driver ***shall immediately be released***.[29] The obvious corollary to that directive is that only those drivers who **do** display visible signs of driving under the influence are subject to further detention. Then, only if the officer can articulate his suspicions may the driver be detained for the limited purpose of obtaining license, registration and insurance information.[30] Finally, only if the driver still appears to be under the influence is further detention permitted to administer the standard field coordination tests.[31] In sum, the DSP procedure only allows for the detention of drivers stopped at a checkpoint where the driver displays visible signs of being under the influence of alcohol or drugs and the officer is able to articulate those visible signs.

The Court finds that the requirement of articulable, visible signs of being under the influence set forth in the DSP guidelines is in no material way different from the requirement of reasonable, articulable suspicion set forth in the OHS guidelines. Accordingly, the DSP procedures do not violate the requirement that

---

[28] *See id.*
[29] *See id.*
[30] *See id.*
[31] *See id.*

the police have reasonable articulable suspicion before detaining a driver stopped at a checkpoint.

## B. The Manner in Which the DSP Guidelines Were Executed Did Not Violate the Defendant's Fourth Amendment Rights.

The Defendant takes issue with the manner in which the DSP guidelines were executed in two respects. He alleges that the amount of time between when the checkpoint was requested and when it was approved did not comport with the guidelines. He also alleges that there was insufficient proof of advance publicity of the checkpoint. Specifically, with respect to the timing of the request for approval of a checkpoint, Paragraph 3 of the DSP checkpoint guidelines requires that a request for approval be made at least one week in advance.[32] The Defendant argues that the State has not proven compliance with that requirement. The State asserts that it has proven compliance. With respect to publicizing the time and location of the checkpoint in advance, the Defendant again argues that the state has provided insufficient proof of publication. The State responds that Lt. Wysock's testimony that checkpoints are always publicized in advance; that he always gets an email confirming publication; and that he does not remember not getting a confirmatory email for this checkpoint is sufficient proof of advance publicity.

The Court finds that the State has established by a preponderance of the evidence that the request for approval was made at least one week prior to the

---

[32] *See id.*

10

checkpoint. The State offered into evidence a memo addressed to Lt. Wysock from Capt. Benson that approved the September 20, 2013 checkpoint.[33] The memo is captioned with the date "September 3, 2013" and Capt. Benson's signature is dated "9/17/13."[34] Whether the memo is a form initiated by Lt. Wysock on September 3rd or that date is when the process of approval began with Capt. Benson, it is more than one week before the date the checkpoint was conducted.

Similarly, the Court also finds by a preponderance of the evidence that the checkpoint was publicized in advance based on the testimony of Lt. Wysock. The Court notes, however, that no requirement for publicizing the location and time of checkpoints in advance appears in either the DSP[35] or OHS[36] guidelines admitted into evidence.

The above discussion is a bit academic, however, because the DSP guidelines that mandate the length of time required to obtain advance approval for a checkpoint and the publication of the time and location of a checkpoint do not have much, if anything, to do with the Fourth Amendment. The primary purpose of the requirement that there be a set of procedures established to conduct checkpoints is to strictly limit the discretionary authority of police officers.[37] Whether the request for approval is made one week or three days in advance of the

---

[33] State's Ex. 3.
[34] *Id.*
[35] State's Ex. 1.
[36] Def's. Ex. 2.
[37] *Henson,* 351 F. App'x at 821.

11

checkpoint has no bearing on that purpose. Similarly, whether or not a checkpoint is publicized in advance, neither enhances, nor diminishes the discretionary authority of police officers.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Evidence is **DENIED.**

**IT IS SO ORDERED.**

_____

**/s/** Ferris W. Wharton, Judge